## HEAVER v. BRADLEY

[No. 413, September Term, 1965.]

*Decided November 9, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*James Robert Miller,* with whom were *Miller & Miller* on the brief, for appellant.

*Andrew W. Starratt, Jr.,* with whom were *Barbee & Starratt* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

This squabble over the custody of minor children has been going on for some years and quite likely it will continue for a few more years.

Barbara Schell (appellant), now 43, is the only daughter of a successful Philadelphia lawyer. Her parents (her father died in 1961) were able to provide her with all of the necessities of life and many of its luxuries. She was sent to expensive schools and exposed to the amenities of Philadelphia society.

On 6 January 1945 she married Charles E. Bradley (appellee) to whom she had been introduced by her brother. On 6 August 1946 Charles Edward Bradley, Jr. (Chet) was born. His sister, Kendall Van Roden Bradley, was born 22 February 1949. Peyton Stewart Bradley, who is the casus belli in this skirmish, was born 26 November 1953.

When the Bradleys separated in October 1957 it was agreed that appellant would have the custody of the children subject to appellee's right to visit them at specified times. The terms of this agreement were not incorporated into the decree of divorce *a vinculo* which followed on 10 December 1957. Three weeks later appellant married Phillip Heaver, her present husband. They have one child, Phillip, Jr., born 23 August 1959.

Appellee's second marriage, which took place about a year later, fell apart within six months. He married his third and present wife in November 1962. They now live in Montgomery County and she feels that their marriage, her first, is a "stable and happy" one. She "enjoys her stepchildren" and she would be willing to give up her job at the World Bank in Washington "to maintain a home for them." She has had no children.

In the summer of 1964 the children visited appellee and his wife. From them he learned that appellant had become an alcoholic and that her husband, Phillip Heaver, during frequent fits of temper, would hurl at the two older children vulgar and obscene epithets and resort, on occasions, to physical violence. Appellee thereupon decided that he would keep the children and

to this end he rented a larger house in Bethesda and arranged for their admission to schools in Montgomery County.

On 4 August 1964 appellant entered Haverford State Hospital. The admission note states, "Chronic alcoholic with uncontrolled drinking and emotional instability. Antagonistic and compulsive behavior. Irresponsible care of young children due to uncontrolled drinking. Filled with rage and hostility." On 27 August 1964, while still a patient at the Haverford hospital, she filed a petition in the Circuit Court for Montgomery County praying, among other things, the return of the children to her.

Appellee answered the petition and, justifying his refusal to return them, alleged that "it is no longer in the best interests of the children to be in the custody of" appellant. He cited her admission to the Haverford hospital and an admission to another institution for the treatment of alcoholism earlier in 1964. He further alleged that the children "steadfastly refuse to return to the * * * [appellant's] home and desire to remain in the custody of * * * [appellee]."

A day long hearing took place on 30 September 1964 the gist of which will appear in the following excerpts from Judge Shure's comments:

> "Well now, Mrs. Heaver and Mr. Bradley, as we all know, these are very unfortunate and distasteful matters to deal with. This is one of the times when I would be very happy not to be a Judge. I have children and grandchildren, and I have, over the years, before I went on the Bench, dealt with problems involving children and you never know whether you are doing the right thing at the time. I couldn't help but feel very badly when I talked to these children, and all you had to do was to look at their fingernails. Both of these girls' fingernails are bitten down as far as they can go. Both of them. This didn't come about just because of an alcoholic mother. This came about because these children have been raised to a large extent in a divorce atmosphere, and you both brought that about. That is over and done with long since, and you are both apparently happily married again and for

this we are all pleased, but the children will always have these scars.

"Now what we are doing now is not something as the result of a complete hearing, but only pendente lite, just a temporary step until the case can be disposed of on its merits.

"Now there are many things that go to make up the present decision which I am about to make. First of all, I don't criticize the father at all for doing what he did. I think if I had been the father I would have kept them in the home with the information he had, so he is not to be criticized at all, but we do have a series of circumstances which do not make the decision I have to make too difficult."

\* \* \*

"\* \* \* Now money, of course, does not bring happiness and I am not suggesting that because one family makes more than the other that this helps the situation other than the bare physical surroundings. We might as well admit it once again, that everyone in this room is in a different social strata than most of the children in this country, and even in this rich County, where all live a little better."

\* \* \*

"We have a very tragic situation involving an alcoholic woman. It took a long time to realize she was one. Now I have no idea whether she is going to change or not. She hasn't had a drink for two months and she says, very sincerely I believe, on the stand that she does now understand her problem and is going to lick it."

\* \* \*

"If you want to say we take a chance, that is one way, I suppose, to look at it. I cannot, as a Judge in this situation, say that at this time we should not give her a chance. I can't say, at this posture of the case, that this will not be in the best interest of the children. I think the children now, at least two of them, do not want to go back with their mother. One of them is

very adamant about it, and one of them is, let's say, lukewarm, and one of them is very mixed up. We won't comment on that any further, but the children's roots are back in Pennsylvania and the mother is back in Pennsylvania, and, at least as far as the two girls are concerned, pendente lite I think they will have to return to this mother. I want them returned immediately, so they can take up their schooling."

\* \* \*

"If this woman starts drinking again, and Mr. Heaver, you cannot have a drink around the house at all, if you are going to help her or help the children. No alcohol in the home at all.

"I will just make this pendente lite with a February first date. If I have to reconsider it at that time. In the meanwhile, if this woman goes back and it comes to my attention that she is again drinking in front of these children, I will take them away from her very promptly, because she obviously cannot drink and shouldn't drink in front of these children, but for their sakes, as well as for hers, I think they should go back, and I will sign the Order."

Judge Shure's order, signed and filed 14 October 1964, awarded the custody of the two girls, Kendall and Peyton, to the appellant *"pendente lite* until February 1, 1965." The appellee was given the custody of Chet, upon the same terms. The order also contained provisions for visitation by both parties.

On 19 November 1964 appellee filed a petition to modify the order of 14 October alleging continued drunkenness on the part of the appellant and her refusal to honor appellee's visitation rights. There appears to have been a brief hearing in this regard which resulted in an order, 24 November 1964, revising appellee's visitation rights.

On 2 December 1964 appellee, in a petition to have appellant adjudged in contempt of court, alleged another refusal to honor his right to visitation.

On 18 December 1964, more testimony was produced in open court. Once again we resort to excerpts from Judge Shure's comments:

"I hardly know where to start, because I have talked with all of these children, at great length. I don't want to betray any confidence that they have placed in me, but it is obvious to me that whatever I say with respect to the observations of any of them, if I repeat it, there is going to be some reprisal, not in punishment, but it is going to be thrown up to them and this is what they all made clear to me, so I am going to try to be very careful not to breach any confidence.

"First, with respect to contempt, I have never found anyone in contempt of Court with respect to visitation rights, unless it should be shown that the person who is charged has actively participated in the refusal.

"We have children, fifteen and eleven, girls. You can't force a child to go with one parent or the other. You can only encourage them to do it and this is as far as you should go. Now, if the Court ever finds out that one parent is deliberately refusing to let the other parent have this child then, of course, they are in contempt of Court, but there is nothing in this evidence that indicates that the mother participated in the refusal. As a matter of fact, the child came out to the car and went back in. The child just didn't want to go. This was her birthday and it meant a great deal to her and this, apparently, was completely overlooked."

\* \* \*

"I find that there is no contempt that is punishable, so this case will be dismissed, but this case goes much deeper than that. As of this moment, these children, all three of them, are trying to be completely loyal to both sides. They really are. This is not often the case, but these children are not only disturbed about the situation that you all have created for them, but they are trying, very hard, to be impartial and help both of you out. Certainly, Mrs. Heaver needs help and certainly, Mr. Bradley, I think you need some help, too. One example I will give you is that this week-end coming up, you have the right to visitation and you can enforce it, and, as I say, unless she would

physically not permit it, you can have these children this week-end, but this is what you are doing to these children. The youngest girl has a week-end planned with her girl friend away from home, that she has planned for weeks. This is Peyton. She says she is sorry she planned it this way but the plan was made three weeks in advance and she completely forgot about this being the week-end that you were to have her. She is in a complete dilemma about it, but if you insist upon taking this girl, you ruin her week-end and this is not going to make her any more loving toward you. Kendall has a big party tomorrow night, and has a date, and so forth. If you take Kendall, then she misses her party and her week-end."

\* \* \*

"Split custody is a horrible situation. This is not split custody, in the true sense of the word, but it is tearing them from one environment to another at close intervals. I am not changing it at this time, but I do suggest that you give prior notice. If you cooperate with these children when they have these parties that are big things in their lives, they are going to love you more for it. Peyton gets upset. I asked her if she liked to come and visit you and she said 'Yes, but I don't like to when I have to give up these other things that have been planned.' They also love their mother."

\* \* \*

"I am no Solomon, and I certainly do not know the answer to these problems, but I know that right now the children seem to be in a fairly happy state, aside from the fact that they are worried about their parents, so I don't see any need for any change at this time. They cannot grow up in an alcoholic home, but as of now there is no reason to disturb the arrangement."

The final hearing, as far as this appeal is concerned, was precipitated, in May 1965, by petitions of both parties and their answers thereto. She charged him with being delinquent in his

*support payments.* He accused her of renewed drunkenness and of evading, on one pretext or another, her obligation to allow the children to visit him. When the testimony produced on 12 July 1965 was concluded Judge Shure commented, in part, as follows:

> "* * * these matters of custody continue to be subject to change from time to time and we had a hearing a year ago and the Court made a change and indicated at that time, that it might be continued or it might be subject to further change as the condition warranted. First, with respect to Charles, the oldest boy, he will remain in the custody of his father. This is where he belongs, and obviously he is not getting along with his stepfather at all and he may be able to get in to school down here. Perhaps he can get into Maryland or some place else. In any event, Charles will be in the custody of his father.
>
> "Kendall, will stay with her mother. Kendall is 16 years old now, and her mother needs her. Kendall has shown a great interest in her mother's problem, and she is of the age now that what damage has been done is beyond repair. * * *.
>
> "With respect to Peyton, Peyton is going back to her father. Mrs. Bradley now is employed and Peyton is only 11 years old and she is in a different category and she is still very impressionable. The mother tried hard, but I am convinced that she is still an alcoholic. It would be in the best interest of Peyton that she go back with her father."
>
> * * *
>
> "Now, with respect to the question of contempt of Court, * * * [appellant] admitted on the stand that she did not deliver these children as ordered. She should have done it and there is no excuse. The court finds her in contempt, and imposes a fine of $100.00."

An order implementing Judge Shure's comments was signed, 16 July 1965, and filed three days later. On 2 September 1965 Judge Shure, in open court and in the presence of counsel and the reporter, dictated the following:

"Gentlemen, on July 16, 1965, following the last of several hearings on the matter, the Court ordered and decreed Barbara S. Heaver be granted guardianship and custody of Kendall Bradley, and that Charles Edward Bradley be granted guardianship and custody of Charles Edward Bradley and Peyton Bradley effective August 1, 1965.

"This Court has been dealing with this matter of custody for in excess of a year and transferred Peyton from the father to the mother along with the older daughter, feeling at that time that the plaintiff, Barbara S. Heaver, who was admitted to be an alcoholic, had straightened herself out and would be a fit and proper mother for these children.

"She promised to the Court she would not drink any more and that she had, in fact, straightened herself to the point where she would abstain. However, the hearings which followed clearly indicated that she had not done this and that she had not abstained.

"The Court, in its discretion, and after investigation made by the probation office of this court, which was made available to the parties, decided that Peyton should be returned to the father for her own best interest.

"Following the Order of July 16 it was brought to the attention of the Court that the transfer had not been made. So, I signed an Order on August 4, 1965, ordering that Barbara Heaver forthwith deliver the minor child to the defendant and that she cease and desist her harassment of the defendant and that Barbara S. Heaver show cause before the 13th of August, at ten o'clock, why she should not be held in contempt for failure to deliver custody to the defendant of Peyton Bradley."

\* \* \*

"The evidence further indicates that there have been no efforts or any offers by the plaintiff since August 1 to deliver this child over to the defendant father. So,

Mrs. Barbara S. Heaver is clearly in contempt of this Court."

There are two appeals to be considered. One is from the decree of 16 July awarding the custody of Peyton to appellee. The other is from the judgment of the court finding appellant to be in contempt of the court and imposing a fine of $100.

What is best for the child is the determining factor in custody cases. As Chief Judge Brune said in *Wilhelm v. Wilhelm*, 214 Md. 80, 84, 133 A. 2d 423 (1957), "It seems unnecessary to cite additional authority in support of this firmly established rule." Continuing, he said:

> "This Court has repeatedly recognized (as in the *Trudeau* [1] case, *supra* and in *Cullotta v. Cullotta*, 193 Md. 374, 66 A. 2d 919) the importance of the opportunity of the Chancellor to see and hear the witnesses in custody cases and the reluctance of this Court to disturb his findings of fact." *Id.* at 84.

See also *Andrews v. Andrews*, 242 Md. 143, 154, 218 A. 2d 194 (1966) and the cases cited therein.

Judge Shure had these parties before him on three separate occasions in less than a year. At one hearing Chet, Kendall and Phillip Heaver also testified. He interviewed the children several times. He had an exhaustive investigation made by the acting supervisor of the Department of Parole and Probation. It is worth noting that the acting supervisor recommended placing Peyton in the custody of appellee. Judge Shure's comments, quoted above, demonstrate an intimacy with the problems of these people which, coupled with his interest and patience, demands of us the greatest respect for his findings, to which we must bow unless compelling reasons require otherwise. *Trudeau v. Trudeau, supra,* and the cases cited therein.

As was suggested by Judge Hammond (now Chief Judge) in *Trudeau,* the Chancellor has retained jurisdiction. Should his solution prove to be contrary to the best interests and welfare of the children, changes can be made. The facilities of the probation department will be available for future investigations and

---

1. *Trudeau v. Trudeau,* 204 Md. 214, 103 A. 2d 563 (1954).

it is safe to assume that neither party will be shy about calling attention to the shortcomings of the other whenever and wherever the welfare of the children is involved.

The reports are full of custody cases. Appellant's brief cites a number of them but since none of them come close to requiring a reversal or a revision of the trial judge's decision we shall not prolong this opinion by a discussion of them. Neither shall we indulge in a discussion of the contempt appeal. In our judgment there was quite enough evidence to support the court's finding.

> *Decree dated 16 July 1965 affirmed.*
> *Judgment and fine in contempt appeal affirmed.*
> *Costs to be paid by appellant.*