KAREN M. ROSS *v.* JOHN H. HOFFMAN ᴇᴛ ᴜx.

[No. 128, September Term, 1976.]

*Decided April 25, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Ann M. Turnbull* for appellant.

*Ronald S. Landsman* for appellees.

ORTH, J., delivered the opinion of the Court.

Once again the courts have been called upon to decide who shall have custody of a minor child. In such disputes it is

always the child who is not only the innocent victim, but who has the most at stake. Caught in the wake of marital discord, or adult indiscretion, or economic adversity, the well-being of the child, both present and future, is usually profoundly affected by the court's resolution of the private dispute over who shall be entrusted with its care. In more primitive societies where the large kinship group is the basic societal unit, child custody problems are solved by leaving the child with the dominant clan. In our society today, however, the social mores do not provide an automatic answer to custody questions. *See Comment*, 73 Yale L. J. 151 (1963).

I

In Maryland, resolving child custody questions is a function of the equity courts. The jurisdiction of a court of equity includes the custody, maintenance, visitation and support of a child. The court may direct who shall have the custody of a child, decide who shall be charged with its support and maintenance, and determine who shall have visitation rights. This jurisdiction is a continuing one, and the court may from time to time set aside or modify its decree or order concerning the child. Maryland Code (1974, 1975 Cum. Supp.) Courts and Judicial Proceedings Article § 3-602.

In exercising its jurisdiction over the custody of a child, the equity court performs two different but related functions: child protection and private-dispute settlement. *See* Mnookin, *Child Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 Law & Contemp. Prob. 226, 291 (1975). Child custody disputes fall into two categories with respect to those seeking custody: disputes between the biological parents and disputes between a biological parent and a third party, often a relative but not infrequently a foster parent, consanguineously unrelated to the child. In performing its child protection function and its private-dispute settlement function the court is governed by what is in the best interests of the particular child and most conducive to his welfare. This best interest standard is

firmly entrenched in Maryland and is deemed to be of transcendent importance.[1] In *Burns v. Bines*, 189 Md. 157, 162, 55 A. 2d 487 (1947), quoting *Barnard v. Godfrey*, 157 Md. 264, 267, 145 A. 614 (1929), we observed that the statute giving equity courts jurisdiction over the custody of children "is declaratory of the inherent power of courts of equity over minors, and [such jurisdiction] should be exercised with the paramount purpose in view of securing the welfare and promoting the best interest of the children." We noted in *Dietrich v. Anderson*, 185 Md. 103, 117, 43 A. 2d 186 (1945) that the statute has been so uniformly construed. We said in *Butler v. Perry*, 210 Md. 332, 342, 123 A. 2d 453 (1956): "Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case."

The best interest standard controls when the dispute over custody of a child is between his biological father and mother. *See Hall v. Triche*, 258 Md. 385, 386, 266 A. 2d 20 (1970); *Goldschmiedt v. Goldschmiedt*, 258 Md. 22, 25, 265 A. 2d 264 (1970); *Krebs v. Krebs*, 255 Md. 264, 266, 257 A. 2d 428 (1969); *Orndoff v. Orndoff*, 252 Md. 519, 522, 250 A. 2d 627 (1969); *Fanning v. Warfield*, 252 Md. 18, 24, 248 A. 2d 890 (1969); *Shanbarker v. Dalton*, 251 Md. 252, 257, 247 A. 2d 278 (1968); *Heaver v. Bradley*, 244 Md. 233, 242, 223 A. 2d 568 (1966); *Snow v. Watson*, 240 Md. 712, 713, 213 A. 2d 748 (1965); *Stimis v. Stimis*, 186 Md. 489, 491, 47 A. 2d 497 (1946). It also controls when the dispute over custody is between a biological parent and a third party. We said in *Dietrich v. Anderson, supra*, 185 Md. at 117-118:

This policy of the law could hardly be expressed with more clarity or emphasis than in the case cited

---

1. Characterized as "of transcendent importance" in Dietrich v. Anderson, 185 Md. 103, 116, 43 A. 2d 186 (1945) the decisiveness of the best interest standard is emphasized by the various other ways reference is made to it in our opinions. For example, it was characterized as the "ultimate test" in Fanning v. Warfield, 252 Md. 18, 24, 248 A. 2d 890 (1969); the "determining factor" in Heaver v. Bradley, 244 Md. 233, 242, 223 A. 2d 568 (1966); the "paramount consideration" in Glick v. Glick, 232 Md. 244, 248, 192 A. 2d 791 (1963); the "sole question" in Young v. Weaver, 185 Md. 328, 331, 44 A. 2d 748 (1945); the "paramount question" in Piotrowski v. State, 179 Md. 377, 381, 18 A. 2d 199 (1941).

in *Kartman v. Kartman,* 163 Md. 19, 22, 161 A. 269 [1932], namely, *Re Petition of Frank B. Bort,* 25 Kan. 308, 37 Am. Rep. 255: *"When the custody of children is the question . . . the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that.* Even when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents and commit the custody to a third person. In other words, a court of chancery stands as a guardian of all children and may interfere at any time and in any way to protect and advance their welfare and interests." (emphasis added).

*See DeGrange v. Kline,* 254 Md. 240, 243, 254 A. 2d 353 (1969); *McClary v. Follett, Jr.,* 226 Md. 436, 441, 174 A. 2d 66 (1961); *Melton v. Connolly,* 219 Md. 184, 188, 148 A. 2d 387 (1959); *Trenton v. Christ,* 216 Md. 418, 420-423, 140 A. 2d 660 (1958); *Ross v. Pick,* 199 Md. 341, 351, 86 A. 2d 463 (1952); *Piotrowski v. State,* 179 Md. 377, 382, 18 A. 2d 199 (1941). In parent-third party disputes, however, there is a twist to the application of the best interest standard.

It was the rule of the common law that parents have the natural right to the custody of their children, and it once was that, "as between mother and father, the primary right to the custody of children is in the father, since it is his duty to provide for the children's protection, maintenance, and education." *Carter v. Carter,* 156 Md. 500, 505, 144 A. 490 (1929); *See Dunnigan v. Dunnigan,* 182 Md. 47, 51-52, 31 A. 2d 634 (1943); *Piotrowski v. State, supra,* 179 Md. at 381-382. Neither of these common law concepts is now viable in Maryland. Our decisions make clear, as we have indicated, that the right of a parent to the custody of the child would not be enforced inexorably, contrary to the best interest of the child, on the theory of an absolute legal right.[2] As

---

**2.** We explained this in Ross v. Pick, 199 Md. 341, 351, 86 A. 2d 463 (1952): This principle is based upon the theory that, while the law of nature gives the parents the right to the custody of their own

between father and mother, the primary right to custody in the father has been abrogated by legislative enactment which, at the same time, affirmed the application of the best interest standard. Maryland Code (1957, 1970 Repl. Vol., 1974 Cum. Supp.) Art. 72A, § 1.[3] Nevertheless, there persists in this State in a contest over the custody of a child, but always subject to the best interest standard, that part of the common law concept which declares that the right of either parent is ordinarily superior to that of anyone else. *Ross v. Pick, supra,* 199 Md. at 351. We declared in *Kartman v. Kartman, supra,* 163 Md. at 23:

[C]ourts are bound, in determining the fate of children, and in fixing the environment which is thereafter to direct the course of their lives, to recognize the natural right of parents to the custody of their children, and unless convinced that it would be injurious to their welfare, to maintain the relationship which society has always recognized as the one most to be desired.

In *Ross v. Pick, supra,* 199 Md. at 351, we set out this principle in the form of a presumption and in language

---

children, a child from time of birth owes allegiance to the State, and the State in return is obligated to regulate the custody of the child whenever necessary for its welfare.

**3.** Maryland Code (1957, 1970 Repl. Vol., 1974 Cum. Supp.) Art. 72A, § 1, provides:

The father and mother are the joint natural guardians of their child under eighteen years of age and are jointly and severally charged with its support, care, nurture, welfare and education. They shall have equal powers and duties, and neither parent has any right superior to the right of the other concerning the child's custody. If either the father or mother dies, or abandons his or her family, or is incapable of acting, the guardianship devolves upon the other parent. Where the parents live apart, the court may award the guardianship of the child to either of them but, in any custody proceeding, neither parent shall be given preference solely because of his or her sex. Provided: The provisions of this article shall not be deemed to affect the existing law relative to the appointment of a third person as guardian of the person of the minor where the parents are unsuitable, or the child's interests would be adversely affected by remaining under the natural guardianship of its parent or parents.

which we have from time to time quoted and in content which we have consistently applied:

> Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.[4]

*See DeGrange v. Kline, supra,* 254 Md. at 242-243; *McClary v. Follett, Jr., supra,* 226 Md. at 442; *Trenton v. Christ, supra,* 216 Md. at 420. We have indicated how the presumption may be rebutted. In *Ross v. Pick, supra,* 199 Md. at 351, we pointed out that the ordinary entitlement of parents to the custody of their minor children by the natural law, the common law, and the statute, is not an absolute one and declared that the right "may be forfeited where it appears that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interests of the child." This principle was recognized by us and applied prior to *Ross, see,* for example, *Dietrich v. Anderson, supra,* and *Piotrowski v. State, supra,* and thereafter, *see,* for example, *McClary v. Follett, Jr., supra,* and *Trenton v. Christ, supra. See* also *DeGrange v. Kline, supra,* and *Melton v. Connolly, supra.*

To recapitulate: the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as

---

4. We set out the rationale of this presumption in Melton v. Connolly, 219 Md. 184, 188, 148 A. 2d 387 (1959) in these words:

> Normally a parent is to be preferred to others in determining custody, largely because the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.

make such custody detrimental to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition.

## II

The case *sub judice* presents squarely wl other there were such exceptional circumstances as to make custody in the biological mother detrimental to the best interest of the child. A contest for the custody of Melinda Dawn Sterquel, now ten years of age, between her mother, Karen Ross and Mr. and Mrs. John Hoffman, who are not consanguineously related to the child, was decided by the Circuit Court of Baltimore City, Watts, J. presiding. By its order of 10 March 1976, that court directed that the Hoffmans have custody of the child, determined visitation rights and charged the mother with the child's support. The mother noted an appeal to the Court of Special Appeals, which affirmed the judgment. *Ross v. Hoffman*, 33 Md. App. 333, 364 A. 2d 596 (1976). We issued a writ of certiorari.

Evidence was adduced at the trial through the testimony of twelve witnesses. Mr. and Mrs. Hoffman, Albert T. Derivan, M.D., Irvin Kelbel, Judith Steglich and Reverend William Howard France, testified in behalf of the Hoffmans. Dr. Derivan was the Medical Director for the Forbush Children's Center of the Sheppard-Pratt Hospital. He was a member of the faculty of the Johns Hopkins University School of Medicine, on the staff of the Kennedy Institute and in private practice. His qualifications as an expert were stipulated by the parties. The chancellor remarked that Dr. Derivan was not hired to testify for the purpose of this case, that he was not testifying "in the traditional sense" but was asked to see the child by another doctor. According to the chancellor, the witnesses "made it clear in his report that his findings were very objective and that he was not hired to

testify for the Hoffmans." Mr. Kelbel, a retired school teacher, had known the Hoffmans for 25 years and had been their neighbor for 12 years. Miss Steglich, only recently employed as an Adoption and Custody Investigator for the Department of Juvenile Services, made the custody investigation. Rev. France, an ordained minister in the Evangelical Methodist Church, and pastor of the Rosedale Community Church, was a neighbor of the Hoffmans and had known them about 16 years. Melinda attended the Sunday School of his church and was active in the Pioneers, a world-wide organization of girls and boys which met at the church every Friday.

Melinda's mother, Mrs. Karen Ross, testified in her own behalf and, in addition, her husband, Robert Ross, Vanessa Moyd, Curtis Barnes, Virginia Barnes, his wife, and Rev. Robert R. Ross testified for her. Mrs. Ross also called Miss Steglich. Mrs. Moyd, a licensed practical nurse, was the mother's supervisor at the nursing home and also knew her socially. Curtis Barnes was the father of Mrs. Ross. Virginia Barnes married Mr. Barnes in 1962 and had been a supervisor with the Commercial Credit Company for 30 years. Reverend Ross, the father-in-law of Mrs. Karen Ross, was the administrator of the nursing home where Mrs. Ross was employed.

It was stipulated by the parties that the chancellor not talk to the child "because of the sensitive nature of the proceedings and because the doctor talked to her." The chancellor was of the opinion that in the circumstances he did not need to talk to her.

There is no question here with respect to the fitness of the parties to have the custody of the child. The chancellor found that Mr. and Mrs. Hoffman were eminently fit to have custody of the child and was "equally emphatic and praiseworthy of Mrs. Ross," stating "unequivocally" that he found "Mrs. Ross to be a fit and proper person to have custody. . . ." Those findings were not disputed.

Lowe, J., speaking for the Court of Special Appeals through a unanimous three judge panel, fairly summarized the evidence showing the facts and circumstances leading to

the contest over the custody of the child, Melinda. *Ross v. Hoffman, supra,* 33 Md. App. at 334-335. We repeat Judge Lowe's compendium in substantial part, amplifying it as necessary from the transcript of the proceedings in the trial court.

Karen Ross was twenty-one years of age when Melinda was born to her on 16 April 1967. Inasmuch as financial necessity required her to work, she retained Mrs. Hoffman as a "babysitter." Melinda was three and a half months old when she was placed in the care of the Hoffmans by her mother. According to Mrs. Hoffman, at first Melinda stayed with her only at night, because Mrs. Ross was on the night shift. Mrs. Ross's schedule of night work created a difficult situation, for she had to deliver Melinda to the Hoffmans late at night and, after working all night, pick the child up by 7:00 o'clock in the morning. The obvious implication is that either Mrs. Ross received little or no rest or the child received proportionately little maternal attention. For a few weeks the mother picked the child up in the morning, and then, to overcome this fatiguing schedule, Mrs. Ross, at Mrs. Hoffman's suggestion, permitted the child to stay with the Hoffmans both day and night throughout the working week "so the child would have proper care." Mrs. Ross would reassume her parental role by taking her child on weekends and her days off. After about a month, the mother stopped taking the child even on weekends, and Melinda actually resided with the Hoffmans full time. Although Mrs. Ross's working shifts varied between 1967 and 1971, the custodial arrangement apparently did not. Furthermore, Mrs. Ross assumed a life style which, had she taken Melinda more often, would have been incompatible with the best interests of the child. She became involved with drugs and had several abortions. Because of the custodial arrangement, however, Melinda was never exposed to these undesirable undertakings. The child remained with the Hoffmans for over eight years. Mrs. Hoffman testified: "Over the whole eight years I remember one week out of that whole eight years that [Mrs. Ross] had her for a week, and then maybe a different occasion, maybe over that period of time, maybe

once or twice, you know, overnight visits when she took her to her grandparents." Mrs. Ross's visits were irregular during the eight years and her support of the child sporadic. Sometimes it would be two or three months between visits and at other times Mrs. Ross would appear two or three times a week. The most she ever gave Mrs. Hoffman for Melinda's support in any one year was about $540 and, in at least one year, she contributed nothing at all. After 1971 it appeared that a reformation may have occurred in Mrs. Ross's way of life. Although she changed her employment on three occasions between 1971 and 1974, she finally settled upon employment at a nursing home. She there met her present husband whom she married on July 12, 1975. Mrs. Ross admitted that from the time Melinda was less than a year old the child resided with the Hoffmans "on a regular basis" and that she made no effort to reclaim her daughter for eight and a half years. Then in 1975, having taken the child for the Labor Day weekend, she returned her to the Hoffmans only when the Hoffmans obtained a court order on 11 September 1975 directing the return of Melinda to them and controlling further visitation by the Rosses.

According to Dr. Derivan, the effect of the child being in the complete care of the Hoffmans for eight and a half years from the time she was a few months old was that she viewed "her primary source of nurturents as coming from Mrs. Hoffman. . . . The child's tie [was] psychologically united with Mrs. Hoffman, so that the biological tie [was not] a primary concern." When the mother attempted to reclaim the child, the child's reaction "was one of emotional upheaval. She was under emotional stress." Melinda told the Doctor that she had "only one problem. I don't know who is taking care of me all the time. . . . [I] used to have one last name, then I have two. Now I wonder if I have any at all." She said that she tried not to worry because "I get bad dreams," which she could not or would not describe. Although the Doctor indicated that the child's emotional upset was "caused more by her fear of abandonment by one or both of the mothers, and not by a fear that she [would] be

removed from the Hoffman to the Ross house," he did not feel that it was in the best interests of the child to place her in the custody of her biological mother because the child viewed Mrs. Hoffman psychologically as the mother. Melinda indicated to Miss Steglich that she recognized Mrs. Karen Ross as her mother and Robert Ross as her stepfather, but referred to them as the ones "responsible for all this trouble." Both Dr. Derivan and Miss Steglich recommended that the child remain in the custody of the Hoffmans at the present time.

It is manifest that the case was fully tried by both sides. From the wealth of evidence adduced, the chancellor made factual findings. Mrs. Hoffman was "the primary source of the nurturing of this child's development" and she was "psychologically the parent." Melinda viewed Mrs. Hoffman as her "primary caretaker." There was a bond of mutual attachment between the child and Mrs. Hoffman which enabled the child's development to proceed satisfactorily, giving the child stability and emotional well-being. Although Melinda appeared to Miss Steglich to be "very shy and quiet and somewhat confused" when interviewed, while in the Hoffman home she was "quite relaxed and very talkative," referring affectionately to her "brother," the Hoffman's son. The home of the Hoffmans was clean and attractive. Melinda had her own room and playroom with many toys and educational materials available to her. Mrs. Hoffman saw that Melinda went to church regularly, not only on Sunday but on Friday nights for the meetings of the Pioneers, which the chancellor thought was "a wholesome thing, which will continue if the child remains with the Hoffmans." Mrs. Hoffman was also active in the P.T.A. and, unlike the mother, showed an interest in Melinda's school. Mrs. Hoffman was "the kind of person that will continue to be very liberal in allowing visitation rights with Mrs. Ross and the grandparents." He was satisfied that "Mr. and Mrs. Hoffman had reared Melinda in a proper manner with love and security and were capable of continuing to do so in the future."

On the other hand, the chancellor had serious doubt that the Rosses had really actively assessed the impact of the move of the child from the Hoffman home, and what effect it would have on Melinda. It may be, the chancellor noted, that the mother was acting upon her own guilt feelings rather than considering the needs of the child. He found it unclear if the Rosses considered that a change of custody would indeed be in the child's best interest. He found that Mrs. Ross had not really involved herself with her daughter, so that it was Mrs. Hoffman who had given the child the mothering and the nurturing rather than the biological mother. The chancellor said:

> *[W]e know what this child can do in the home of the Hoffmans.* She is well-developed and healthy, and if we change the custody, we are not sure whether Mrs. Ross and her new husband and this child can interact meaningfully with her. What the relationship with the child would be with Mrs. Ross [is unknown] and the court feels, as Dr. Derivan feels, maybe we shouldn't risk this at this time. (emphasis added).

The chancellor observed that Mrs. Ross had her own growing up to do in terms of her marriage and believed that it might be damaging to thrust the child into that milieu at this time. He said: "I don't feel at this time we should thrust this child into the new environment and take her out of the love and environment she has." He found that "[t]he only reason Mrs. Ross has presented [for a change of custody] is that she is the natural mother." The chancellor did not find this controlling in the circumstances. He referred to the length of time Melinda had been away from her mother and the long period which had elapsed before reclamation was sought. He said that "it is a little late to make any serious uprooting of this child from Mrs. Hoffman." He concluded "that at this time it would not be in the best interest of this child to change custody."

The chancellor issued a decretal order on 10 March 1976 which granted permanent custody to the Hoffmans with

liberal visitation privileges to Mrs. Ross, and directed Mrs. Ross to pay the Hoffmans $20 a week for the support of the child, commencing 90 days from 8 March. All was subject to the further order of the court.

## III

The precise question before us is whether the judgment of the Court of Special Appeals which affirmed the judgment of the Circuit Court of Baltimore City should be affirmed or reversed.

We clarified the role played by this Court and the Court of Special Appeals in child custody disputes in *Davis v. Davis*, 280 Md. 119, 372 A. 2d 231 (1977). We pointed out that there are three distinct aspects of appellate review in such cases. The first concerns factual findings by the chancellor. The second is with respect to the law applied by him. The third is his ultimate conclusion.

As to the first aspect concerning factual findings, we said: "When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies." [5] *Id.*, at 125-26. The suggestion of the Court of Special Appeals in *Sullivan v. Auslaender*, 12 Md. App. 1, 3-4, 276 A. 2d 698 (1971) that it must accept the chancellor's factual findings and his view of the evidence if not clearly erroneous was in full accord with this. We noted "that when it appears on review that the chancellor failed to take sufficient evidence into account, we may remand the case without affirmance or reversal for a redetermination, after further proceedings, as to what is in the best interests of the children." *Davis v. Davis, supra,* 280 Md. at 126.

---

**5.** Maryland Rule 886, applicable to the Court of Appeals, and Maryland Rule 1086, applicable to the Court of Special Appeals, are identical:

When an action has been tried by a lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.

As to the second aspect, we observed: "If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless." *Id.*, at 126.

As to the third aspect, we declared: "[W]hen the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Id.*, at 126. This rejects the notion of the Court of Special Appeals expressed in *Sullivan v. Auslaender, supra,* 12 Md. App. at 4, that when the chancellor properly applies the applicable law and his factual findings are not clearly erroneous, the appellate court must exercise its best judgment in determining whether the conclusion of the chancellor was the best one for the welfare, benefit and interest of the child.

The teaching of *Davis v. Davis, supra,* is plain. The ultimate conclusion as to the custody of a child is within the sound discretion of the chancellor. That conclusion is neither bound by the strictures of the clearly erroneous rule, that rule applying only to factual findings of the chancellor in reaching the conclusion, nor is it a matter of the best judgment of the reviewing court. It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused. This is the principle which controls the review of any matter within the sound discretion of a trial court as distinguished from a judgment falling squarely within the ambit of the clearly erroneous rule. In the latter situation, the appellate court "must consider the evidence produced at trial in a light most favorable to the prevailing party there and if substantial evidence was presented to support the trial court's determination it is not clearly erroneous and cannot be disturbed." *A. S. Abell Co. v. Skeen,* 265 Md. 53, 55, 288 A. 2d 596 (1972). *See Delmarva Drilling Co. v. Tuckahoe,* 268 Md. 417, 424, 302 A. 2d 37 (1973); *Clemson v. Butler*

*Aviation,* 266 Md. 666, 671-672, 296 A. 2d 419 (1972); *Liller v. Logsdon,* 261 Md. 367, 368-369, 275 A. 2d 469 (1971); *Simmons v. B. & E. Landscaping Co.,* 256 Md. 13, 17, 259 A. 2d 314 (1969).

## IV

The factual findings of the chancellor which we have set out were not clearly erroneous. There was evidence adduced which, if believed, was legally sufficient to support those findings. Scrutinizing them in the light of that evidence, we have no difficulty in determining that he was not clearly wrong in arriving at them. *Sullivan v. Mosner,* 266 Md. 479, 490, 295 A. 2d 482 (1972); *Boettcher v. Van Lill,* 263 Md. 113, 120, 282 A. 2d 122 (1971). Furthermore, the chancellor recognized the applicable law. He emphasized that the best interest of the child was the paramount consideration. He cited *DeGrange v. Kline, Trenton v. Christ, Melton v. Connolly,* and *Ross v. Pick,* all *supra,* and quoting the *prima facie* presumption set out in those cases, referred to the burden cast upon the Hoffmans to rebut it. The question at this point is whether in light of the facts and the law there were exceptional circumstances which would make custody in the mother detrimental to the best interest of the child. If there were, the award of custody to the Hoffmans was proper. If there were not, custody should have been placed in the mother, and the award made was improper.

We are aware that due to the vagaries of human nature and the infinite variety of people's actions, no two sets of facts and circumstances in child custody disputes are alike. And we heed what Judge W. Mitchell Digges, perceiving this, said for the Court in *Barnard v. Godfrey, supra,* 157 Md. at 267-268: "There can be no binding, and very little helpful, precedent found in the decisions of the courts on this subject, because essentially each case must depend upon its peculiar circumstances. . . ." But when we look at our prior decisions concerning parent-third party disputes over custody in which the fitness of the parent was not in question so that the existence of exceptional circumstances to overcome the presumption in favor of the parent was the

issue, there appear certain factors which the Court considered. These factors may serve as a guide.

In *Piotrowski v. State, supra,* the dispute was between the father and the maternal grandparents. The child, Vivian, was eight years of age and had lived with her grandparents since the age of four months. The father, who had remarried, was a naturalized citizen forty-five years of age. He had served in World War I and received an honorable discharge. He had been employed at Edgewood Arsenal for over 20 years. "He [was] a well-behaved, industrious man, respected by his neighbors, and ... interested in his daughter." 179 Md. at 379. His wife was well thought of among her neighbors, and wanted custody granted to her husband. Their home was in excellent condition and kept neatly. Their five year old child appeared to be a well behaved boy. The Court recognized the rule of the common law that parents have the natural right to custody of their children, but observed that "this rule must yield to the paramount consideration of what will be the best interest of the children and most conducive to their welfare. . . ." *Id.,* at 382. The Court, observing that the child was receiving the care and affection of a mother from her grandmother said:

> We are convinced that it would be injurious to Vivian to remove her from the home where she has lived since infancy. We further believe that the happiness, training, development and morals of the child will be maintained in her present environment. It is doubtful whether her condition would be improved by a change, and it might be very detrimental to her. To satisfy the natural and commendable paternal love of her father would mean her removal from the only home she has ever known. We do not deem it advisable to remove her from this care, affection, and attention. *Id.,* at 383.

In *Dietrich v. Anderson, supra,* the child had been in the care of foster parents from the age of ten months and remained in their custody for some five years. 185 Md. at 116. The Court quoted at length and with obvious approval

the words of Brewer, J., later a justice of the Supreme Court of the United States, in *Chapsky v. Wood*, 26 Kan. 650-653, 40 Am. Rep. 321 (1881):

[Y]et, when ... the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This distinction must be recognized. If, immediately after the gift, reclamation be sought, and the father is not what may be called an unfit person by reason of immorality, etc., the courts will pay little attention to any mere speculation as to the probability of benefit to the child by leaving or returning it. In other words, they will consider that the law of nature, which declares the strength of a father's love, is more to be considered than any mere speculation whatever as to the advantages which possible wealth and social position might otherwise bestow. But, on the other hand, when reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change. It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel. *Id.*, at 118-119.

Faced with a picture of instability and uncertainty as to the child's immediate future with her father, the Court left her with the foster parents.

In *Ross v. Pick, supra,* 199 Md. at 351-353, the Court declared that an important feature was that third-party custodians had the care and custody of the child from the time he was less than two years old until he was eleven and found "no sufficient reason" to justify the action of the trial court in awarding custody to the mother. It appeared that the Court gave heavy weight to the opinion of the Probation Department, expressed after a thorough investigation, and based upon the advice of a physician, that "abrupt removal of the child from the [foster parents] would probably have an injurious effect upon his personality and social growth." *Id.,* at 354.

In *Trenton v. Christ, supra,* it was freely conceded that there was nothing wrong with the father, his second wife, or his home, which would make him unfit to have the custody of his ten year old daughter. The Court stated, 216 Md. at 420-421, that "[t]his case resolves into a question of whether the circumstances are so exceptional as to justify the grant of custody of the child to the grandparents . . ." as against the father. The child had lived with her maternal grandparents for about six years. The Court saw a genuine risk to the child's well being in the proposed change, and affirmed the decree leaving the child with the grandparents, observing: "It is manifest that the mere contemplation of the change produced a serious emotional upset." *Id.,* at 423.

In *Melton v. Connolly, supra,* 219 Md. at 189, the Court expressly asserted: "Another guide in these cases is the length of time the child has been away from the parent." It cited *Dietrich v. Anderson, supra,* and quoted and applied its statements with respect to reclamation. "The evidence was somewhat conflicting as to the intensity and genuineness of the father's desire to have his children . . ." *id.,* at 187, and the ties between the five year old girl who was the subject of the dispute and her foster parents were "numerous and strong," she having lived with them for four and a half years and they having the ability "to do that which the prompting of the ties compel," *id.,* at 189. We reversed a decree giving custody to the father. *Compare, McClary v. Follett, Jr., supra,* 226 Md. at 442,

where we found the record "barren of any showing of unusual or exceptional circumstances" that would render the father's custody of his son detrimental to the best interests of the child, and affirmed an order rescinding a decree that granted adoptive parents the adoption of the boy and awarded custody to the natural father.

The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.

We note also several general observations on the point which were expressed in *Bennett v. Jeffreys*, 387 N.Y.S.2d 821, 827, 356 N.E.2d 277 (1976). The child may be so long in the custody of the nonparent that, even though there has been no abandonment or persistent neglect by the parent, the psychological trauma of removal is grave enough to be detrimental to the best interest of the child.[6] The court may consider whether the child is in the present custody of the parent or nonparent. "Changes in conditions which affect the relative desirability of custodians, even when the contest is between two natural parents, are not to be accorded significance unless the advantages of changing custody outweigh the essential principle of continued and stable custody of children." *Id.*, at 827. In custody matters, the court may look to the auxiliary services of psychiatrists, psychologists, and trained social workers, with the caveat that reliance should not be too obsequious or routine or the experts too casual.

---

6. Of course, the court may not, under the guise of the best interest standard weigh the material advantages offered by the adverse parties. *See* McClary v. Follett, Jr., 226 Md. 436, 442, 174 A. 2d 66 (1961).

In our prior decisions not all of the factors which were considered from time to time in determining the existence of exceptional circumstances have appeared in one case. Here, however, practically all of them were present. The chancellor could properly find the existence of exceptional circumstances which would make custody in the mother detrimental to the best interest of the child from the protracted separation of mother from child, beginning at the child's tender age of about four months and lasting for eight and a half years, combined with the strong attachment of the child to the custodian, the emotional reaction of the child to the dispute over her custody and the possible emotional effect on her if the change were made, the uncertainty of the stability of the mother's household in light of her marriage, the lapse of some eight years before the mother attempted to reclaim the child, the questions as to the real motive of the mother in seeking reclamation and as to the genuineness of her desire to have the custody of her daughter. There being exceptional circumstances rebutting the presumption that custody in the mother was in the best interest of the child, the chancellor properly considered who should be awarded custody in order to subserve the child's best interest. His conclusion, that custody in the Hoffmans was in the child's best interest was founded upon sound legal principles and was based upon factual findings that were not clearly erroneous.

It is obvious from the comprehensive opinion of the Court of Special Appeals that it was fully aware of what we have set out here and was sensitive to its implications. It held that the chancellor's conclusion was the one which served the child's best interests. It reached this determination, however, by exercising its own best judgment under *Sullivan v. Auslaender, supra.* We arrive at the same decision by finding that there was not a clear abuse of discretion by the chancellor. Judge Watts gave careful consideration to the problems involved and his opinion was a thorough and thoughtful one. He paid no homage to homilies, and he made no fetish of formulas. *See Ex Parte Frantum,* 214 Md. 100, 107, 133 A. 2d 408 (1957), (Hammond, J., dissenting). His

judgment as to the custody of the child reflected the sound exercise of judicial discretion and cannot be disturbed.[7]

## VI

As we have indicated, the chancellor ordered that Mrs. Ross pay the Hoffmans $20 a week for the support of the child. The Court of Special Appeals noted: "There is irony, if not an aura of injustice, in an order denying a natural mother her child, then compelling payment to those who have taken her." *Ross v. Hoffman, supra,* 33 Md. App., note 3 at 335. Because the issue was not raised before it or below, the Court of Special Appeals, invoking Maryland Rule 1085 applicable to it, did not respond to the issue.

In rendering his decision the chancellor remarked that the parties had "made a lot to do about money, and I think there should be a contribution, and I will continue the twenty dollars per week [paid by Mrs. Ross]. Let us suspend payment for ninety days. . . . [Y]ou [Mrs. Ross] have an obligation to support her." He suggested that Mrs. Ross's solicitor "go after this husband and request an increase from the ten dollars that the father of the child is giving." Appreciating the aura of injustice noted by the Court of Special Appeals, and as the matter of support was decided by the chancellor, we respond to the matter for the guidance of the trial court. We think that justice requires that Mrs. Ross pay to the Hoffmans only such amounts as are received by her for the support of the child from the child's father. This does not mean that Mrs. Ross should not take steps as the chancellor suggested to obtain increased support from the father, or that Mrs. Ross herself may not assist in the child's support for the child's benefit if she so desires.

The Court of Special Appeals shall remand the case with direction to the Circuit Court of Baltimore City to modify its

---

7. Mrs. Ross contends as a facet of her one contention that the chancellor erred in awarding custody to the Hoffmans that he "erroneously relied on the theory of 'psychological parenthood'." We do not agree that he so relied and adopt as reasons for our disagreement those set out in the opinion of the Court of Special Appeals in disposing of the point. Ross v. Hoffman, 33 Md. App. 333, 336-338, 364 A. 2d 596 (1976).

order with respect to support of the child in accordance with this opinion. As so modified the judgment of the Court of Special Appeals is affirmed.

> *Judgment of the Court of Special Appeals modified in accordance with this opinion and as modified is affirmed; costs to be paid by appellant.*