# IN THE COURT OF APPEALS OF IOWA

No. 24-0325
Filed October 30, 2024

**NATALIA M. RYNER,**
        Plaintiff-Appellant,

**vs.**

**NOAH DAVID AKERS,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Marshall County, Adria Kester,

Judge.


        A mother appeals a visitation schedule ordered by the district court in a

custody dispute. **AFFIRMED AS MODIFIED AND REMANDED.**


        Barry S. Kaplan of Kaplan & Frese, LLP, Marshalltown, for appellant.

        Noah Akers, Lewisville, Texas, self-represented appellee.


        Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

"Summertime is always the best of what might be," once said the author and journalist Charles Bowden. In this case, we are called to determine whether a summer visitation schedule set for a two-year-old boy—whose parents live nearly a thousand miles apart—is appropriate. After our de novo review of the record, we find the district court came up with an equitable visitation schedule given the unique circumstances presented in this case. However, we modify the district court's summer visitation schedule in one respect.

Instead of nearly eight weeks of what, in practice, will likely be uninterrupted summer visitation with the father in Texas, we find the best interest of the child is better served with five weeks of uninterrupted summer visitation. We believe such a schedule better considers the situations of the mother and father while still serving the child's best interests.

## I. Background Facts and Proceedings

Natalia Ryner and Noah Akers were in a relationship and lived together in the Des Moines area in 2019. The two never married, but their relationship produced a son—J.L.A.—born in October 2021. After J.L.A. was born, the couple moved into a home together in Marshalltown. But the relationship soured. In October 2022, Ryner moved out of the couple's home to another place in Marshalltown, taking J.L.A. with her. Akers moved to Ankeny not long after Ryner moved out.

After their relationship ended, Ryner and Akers agreed to an informal visitation schedule, under which Akers would get to see J.L.A. every other weekend. However, Akers took minimal advantage of this informal visitation

schedule and only saw J.L.A. twenty-eight days during the fifteen months before he moved out of Iowa. According to Ryner, Akers frequently made excuses for why he could not visit J.L.A.

Feeling "there was nothing really here for him" in Iowa, Akers moved to the Dallas, Texas area in March 2023. Akers's move was motivated by a desire to be closer to his grandmother, aunt, and uncle. According to Akers, he views these family members as his "support system." After his move to the Dallas area, Akers's contact with Ryner and J.L.A. consisted of eleven phone calls.

On April 26, 2023, Ryner filed a petition for custody and a request for an injunction. In her petition, Ryner requested she be granted physical care of J.L.A. Additionally, she requested an injunction be issued to prevent Akers from removing J.L.A. from Iowa. She also requested that an order be entered requiring Akers's visits to occur in Iowa. In his answer, Akers requested the parties be granted joint legal custody "with appropriate orders for parenting time." The record discloses a child support order had previously been entered, ordering Akers to pay Ryner $575 per month. But Akers—at the time of trial—was well behind on child support payments by over $4000.[1]

The district court entered a temporary visitation order requiring Akers's visits with J.L.A. to occur in Iowa. Under this temporary order, Akers would have J.L.A. one weekend a month from October 2023 to January 2024. Akers visited with J.L.A. in October and November, but he did not make visits in December and

---

[1] Akers acknowledged in his testimony at trial that he was currently $4021 behind on his child support payments because he was "out of a job for a significant amount of time." But Akers stated, "[m]y plan is to catch up all the way and have that caught up 100 percent as quickly as I can."

January because it was not in his "best interest for financial reasons." In a pre-trial joint stipulation, Ryner proposed a visitation schedule under which Akers would have J.L.A. one weekend per month until the child turned sixteen. Once the child reaches the age of sixteen, Ryner would agree to visits taking place in Texas if Akers traveled with J.L.A. and paid for transportation costs. Akers proposed that he receive one-half of every summer, one-half of every school winter break, every school spring break, and alternating holidays.[2] Akers requested that "he be responsible for getting the child at the beginning of his visits and that [Ryner] be responsible for retrieving the child at conclusions of visits."

Trial was held on February 8, 2024. At the time of trial, Ryner was twenty-three years old, while Akers was twenty-four. Ryner testified she is employed as a waitress at a restaurant in Marshalltown and earns approximately $14,000 per year. Ryner works at the restaurant because it offers her flexible hours, which allows her to spend more time with J.L.A. In her testimony, Ryner reiterated she wants Akers's visits with J.L.A. to occur in Iowa until "he's of an older age, maybe 12, 13, 14." She stated she did not want J.L.A. to have extended visits with Akers in Texas because "there's a lot of promises that are made that aren't kept." Ryner testified J.L.A. has formed close bonds with her family in Iowa and that she did not believe extended visits with Akers in Texas were in his best interest.

Akers also testified at the trial. He testified he is employed as an area sales manager with an energy drink distributor in the Dallas area. He earns a salary of

---

[2] We note the district court ordered a summer visitation schedule more liberal than that which Akers requested.

$48,000 per year. He currently lives in Arlington—a large suburb of Dallas—with his fiancé and her young son. Akers stated he believes his visits with J.L.A. should occur in Texas because he believes it is important for his son to bond with his extended family members residing in the Dallas area.

The district court entered its ruling on Ryner's petition on February 14, 2024. The court granted the parties joint legal custody and placed J.L.A. in Ryner's physical care. The order allows Akers one weekend visit per month, which is to take place in Marshalltown until J.L.A. is five years old. Under this arrangement, Akers would have J.L.A. one weekend per month. Additionally, the district court stated, "[b]eginning and until the child reaches the age of five," Akers "shall have one week of visitation with J.L.A. not to begin until after the first Sunday in June." This visit is not required to take place in Iowa, but Akers was to provide transportation for this visit and be responsible for transportation costs.

However, after J.L.A. reached the age of five, Akers was granted significant summer visitation. The district court provided, "[c]ommencing one week after school lets out for the summer and ending one week before it begins," Akers would have visitation with J.L.A. In other words, as we explain below, the five-year-old will likely spend his entire summers with someone he has had limited contact with to this point. Akers was ordered to provide transportation for these visits and to be responsible for transportation costs.

Additionally, Ryner was given three non-consecutive weeks with J.L.A. in the summers, which were to occur in one-week blocks of time. Ryner was ordered to provide transportation for these visits. Although these three non-consecutive weeks of visitation may occur in Iowa, this visitation schedule could result in J.L.A.

potentially spending as much as ninety-six hours on the interstate during his summers.

Ryner subsequently moved to amend and reconsider, asking the district court to revise its summer visitation schedule that goes into effect when J.L.A. reaches the age of five. The district court denied this motion. Ryner now appeals the visitation schedule outlined by the district court in its order. Specifically, Ryner contends the summer visitation schedule to take effect when J.L.A. turns five is inappropriate.

## II. Standard of Review

"Our review of equitable proceedings is de novo." *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017); *accord* Iowa R. App. P. 6.907. "We give weight to the fact findings of the district court, especially in determining the credibility of witnesses, but are not bound by them." *In re Marriage of Vieth*, 591 N.W.2d 639, 640 (Iowa Ct. App. 1999).

## III. Analysis

### A. Summer Visitation

Ryner asserts the summer visitation schedule that takes effect when J.L.A. turns five is inappropriate because he will be spending most of his summers in Texas, while most of his family and friends will be in Iowa. Ryner contends that, as J.L.A. grows older, he will likely be involved in common summer activities with school friends in Iowa. Ryner also takes issue with the three non-consecutive weeks she gets with J.L.A. in the summer. She argues such a schedule is unnecessarily disruptive for J.L.A. Additionally, she contends it is inappropriate to require her to be responsible to pay for the transportation associated with her three

non-consecutive visits in the summer. We agree with Ryner that some modification of the summer visitation schedule is appropriate

The legislature has specifically instructed the courts to grant "liberal visitation rights where appropriate" to assure the child "the opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a) (2023). In determining an appropriate visitation schedule, our focus must be on the child's best interest. *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Thus, courts are to fashion a visitation schedule that serves the best interests of the child. *In re Marriage of Gensley*, 777 N.W.2d 705, 718 (Iowa Ct. App. 2009).

Applying these principles, we find the summer visitation schedule that takes effect once J.L.A. turns five suffers from two flaws: financial feasibility and disruption to the child's life. First, we note the practical difficulties of giving Ryner three nonconsecutive weeklong visits during the summer. Given Ryner's limited financial means, we question whether she will be able to exercise her visitation rights for three nonconsecutive weeks during the summers. Ryner testified at trial that she earns approximately $14,000 per year as a waitress. Thus, Ryner will likely be unable to afford to drive or fly down to Texas to exercise her visitation.

The district court's summer visitation schedule does not consider the costs associated with hotels, food, and entertainment if Ryner chooses to stay in Texas during her visits with J.L.A. It also does not consider the costs associated with Ryner possibly transporting J.L.A. back to Iowa with her for summer visits. It does not consider the costs associated by Ryner ostensibly missing three weeks of work unpaid. We believe the practical effect of the district court's summer visitation

schedule will result in J.L.A. spending little time with his mother during the summer, which we cannot find is in his best interest. *See Ryan v. Wright*, No. 17-1375, 2018 WL 2246882, at *4 (Iowa Ct. App. May 16, 2018) (finding a summer visitation schedule was not in the best interests of the children because it deprived them of meaningful time with their mother).

Second, we note the disruption the district court's summer visitation schedule will cause J.L.A. Beginning at the age of five, he will be spending his entire summer away from the only home he has ever known with someone who has never been his caretaker—someone who he has never resided with. Such an extreme rupture of J.L.A.'s home environment has unforeseen traumatic attachment consequences. Children thrive not only in stability but in the understanding that those who they are most bonded to will return. Given the financial considerations above, the mother's three non-consecutive weeks of visitation to Texas—on her dime—all but ensures no visitation. And no visitation would be devastating to J.L.A.'s development.

Additionally, the district court's summer visitation schedule will deprive J.L.A. of meaningful contact with his friends from school in Iowa and opportunities to participate in summer recreational activities in his hometown. *See id.* (noting the district court's summer visitation schedule was inappropriate because it deprived the children of opportunities to spend time with their school friends and to participate in summer recreational activities in their hometown).

Finally, assuming Ryner will be able to somehow afford to exercise three nonconsecutive visits with J.L.A. during the summers, these visits will

unnecessarily disrupt visits with the father.[3] We find this troublesome because the summers offer the best opportunity for J.L.A. to meaningfully bond with his father. Although Akers was given visitation one weekend per month during the school year by the district court, he is unlikely to utilize many of these visits due to his current financial situation and the difficulties of traveling to Iowa from Texas. Akers testified at trial that he earns a salary of $48,000. Thus, the summers likely present the best opportunity for J.L.A. to form a close bond and relationship with his father. We think it is best for J.L.A. to have extended uninterrupted visits with his father during the summers. *See id.* (finding it was in the children's best interest to have uninterrupted visits with their father during the summer). We believe uninterrupted visits with Akers during the summers will best further the statutory goal of maximizing continuing relationships with both parents. *See* Iowa Code § 598.41(1)(a).

Accordingly, we find it necessary to modify the district court's summer visitation schedule once J.L.A. turns five. When J.L.A. reaches the age of five, Akers is to have uninterrupted visitation with J.L.A. beginning on July 1 and ending on the first Friday in August, or the Friday preceding the first week of the school year, if earlier. Akers shall be responsible for transportation of J.L.A. to Texas and

---

[3] We also note that, even if Ryner is financially capable of exercising her three nonconsecutive weeklong visits during the summers, disruption will necessarily follow for J.L.A. Assuming Ryner drives or flies down to Texas and stays with J.L.A. in Texas for their visits, they will likely be living out of a hotel for three weeks every summer. Further, if Ryner chooses to drive down to Texas and take J.L.A. back to Iowa, this could result in J.L.A. spending a considerable amount of time on the interstate. This is not in J.L.A.'s best interest. *See Ross v. Hoffman*, 372 A.2d 582, 584 (Md. 1977) ("In such disputes it is always the child who is not only the innocent victim, but who has the most at stake.").

its associated costs. Ryner will be responsible for transportation of J.L.A. back to Iowa and its associated costs. We believe such a summer visitation schedule properly considers the realities of the parties while still furthering the best interests of the child. We affirm the district court's visitation schedule in all other respects.

### B. Appellate Attorney's Fees

Lastly, we note Ryner requests Akers be required to pay $2500 towards her appellate attorney fees.

An award of appellate attorney fees rests within the sound discretion of this court. *Markey v. Carney*, 705 N.W.2d 13, 25 (Iowa 2005). In deciding whether to award appellate attorney fees, "[w]e consider the needs of the party making the request, the ability of the other party to pay, and whether the party was required to defend the district court's decision on appeal." *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007).

After considering these factors, we find an award of appellate attorneys for Ryner is appropriate. But because she has not provided an affidavit of attorney fees to support her request for $2500, we remand to the district court to determine the amount of appellate attorney fees to be awarded her and to enter judgement against Akers in a reasonable amount. *See Slusser v. Stevens*, No. 22-0072, 2022 WL 2824773, at *3 (Iowa Ct. App. July 20, 2022).

## IV. Conclusion

In sum, we affirm the district court's summer visitation schedule with one exception. When the child reaches the age of five, the father is to have uninterrupted summer visitation beginning on July 1 and ending on the first Friday in August, or the Friday preceding the first week of the school year, if earlier.

Additionally, we grant the mother's request for appellate attorney fees and remand to the district court to determine the amount of such fees.

**AFFIRMED AS MODIFIED AND REMANDED.**