McCLARY et al. *v.* FOLLETT, JR.

[No. 16, September Term, 1961.]

*Decided October 12, 1961.*

The case was argued before HENDERSON, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Louis Salzman* and *Harold Buchman,* with whom was *Lawrence B. Coshnear,* for the appellants.

*Marvin M. Polikoff,* with whom was *Leroy H. List,* for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

Adoptive parents have appealed from an order of the Circuit Court of Baltimore City, which rescinded the decree that had granted them the adoption of a minor child, and awarded the custody of the child to its natural father.

The appellants raise two questions for our consideration:

(1) they argue that the trial court erred in failing to find as a fact that the appellee had relinquished his parental rights in relation to the child by abandonment, and (2) in awarding custody of the child to the father in derogation (they contend) of the best interests and welfare of the child, and without a Probation Department investigation.

The appellee and one Helen Hotalen were married in Baltimore in 1953, and thereafter lived together as man and wife. The wife had had an infant daughter by a previous marriage, who resided with them. The infant boy involved herein was born on August 25, 1956. The husband and wife continued to live together until April, 1957, when they separated, the children staying with their mother. Several weeks after the separation, the police warned the mother that unless she took better care of the daughter, steps would be taken to remove the child from her custody; whereupon, she telephoned the appellee and requested that he take the daughter, which he did, and she has remained with, and been supported by, him ever since. When he went for the daughter, he was told that his son was "down the country," but if he would return on the following Sunday, he could "pick up" the boy. His return on Sunday availed him nothing: his wife, as well as the son had disappeared. The chancellor found that, thereafter, the appellee made "repeated [but unsuccessful] efforts to locate the whereabouts of his wife," in an attempt to obtain custody of his son.

Early in 1959, the appellee entered the Veterans Hospital in Baltimore, and he was informed by the hospital authorities that they could find no record of his son's birth. Investigation at the Bureau of Vital Statistics revealed that the child, purportedly, had been adopted. This information was received by the appellee in May, 1959, and it was his first notice of any adoption proceedings. Counsel was promptly engaged, and a petition soon followed requesting that the adoption proceedings be opened to ascertain if any fraud had been perpetrated. Upon investigation thereof, it was revealed that the natural mother of the child had falsely sworn that she was unwed; that the child was born out of wedlock; that Follett was an assumed name of her "boy friend," who was the father

of the child; and that she did not know the location of the residence of the natural father.

The adopting parents were married in 1950; the wife, at the time of the adoption, worked in a tavern where she became acquainted with the natural mother; and the adopting father was, and still is, in the army, being now stationed in Texas.

The chancellor held that the natural mother had perpetrated a "gross fraud" in the adoption proceedings; that it was uncontradicted that the appellee received no notice of such proceedings, in accordance with Code (1957), Article 16, Section 75, and he did not consent thereto; and that, irrespective of the provisions of Section 79 [1] of the same article of the Code, due to the fraud and lack of notice or consent, the decree of adoption should be declared null and void; and, as he was "convinced that the child would have a good home with his father and paternal grandparents," he ordered that the custody of the child be given to the natural father. From a decree, which put these holdings into effect, the appellants appealed.

I

This contention of the appellants has two prongs, but neither tine is very long nor deeply penetrating. They first insist that the chancellor was clearly in error in not finding that the natural father lost his parental rights in the child by abandonment, arguing that he made no sincere attempt to locate the child after he and his wife had separated, or to see that the boy was properly supported. They further claim that the father's only motive in regaining the child is the additional monetary assistance that he will receive from the government. The short, but complete, answer to this contention is that it, simply, is not supported by the record. In addition to detailing other efforts to locate his wife and through her his son, the appellant replied to a question as to how many times had he tried to locate them in 1957 and 1958,

---

1. Section 79, in part, states: "No attempt to invalidate a final decree of adoption by reason of any jurisdictional or procedural defect shall be received by the court, or by any court of this State, unless regularly filed with such court within one year following the entry of the final decree."

as follows: "Well, it was more or less a continual thing trying to find out where she was." The chancellor found, as we pointed out above, that the appellee made "repeated efforts" to locate the wife, and, in this finding, we cannot say that he was clearly erroneous. Maryland Rule 886. In regard to the purported sinister motive of receiving additional compensation from the government, while the exact amount of additional money that he will receive is not shown, it is a matter of general knowledge that the amount awarded by the government to a disabled parent because of a dependent child, ordinarily, is not sufficient, in the present state of the economy, adequately to support and clothe it, much less to realize any gain or advantage from the award. The record shows that he now receives a monthly service-connected disability (presumably for himself and his stepchild) of $143.00. We think the record is sufficient to support the chancellor in his finding that the natural father had not lost, nor relinquished, his parental rights. Maryland Rule 886.

This ruling also answers the second segment of this contention, which is a claim that the chancellor should have decided the case in their favor "inasmuch as the exception to statutory finality [namely, that fraud in the obtention of the adoption decree, which fraud resulted in the appellee not being notified of the adoption proceedings, created an exception to Article 16, Section 79, set forth in footnote 1] did not apply to this appellee." The appellants state the quoted provisions of said Section 79; call attention to the fact that the welfare and best interests of the child are the primary considerations in all adoption proceedings; note that the chancellor held that "fraud vitiates everything that it permeates," citing 1 M. L. E. p. 237; and say that "as a general proposition of law, the Chancellor's citation can elicit no quarrel." They further recognize that the natural mother "represented falsely" the facts, as we outlined them above, and, as a consequence, the appellee "was not notified of the proceedings to adopt his son and was not given an opportunity to object to the adoption," and that "the Chancellor below had a duty to hear [the appellee's] grievance because of an apparent fraud." But they contend that, as applied to the facts in the instant

case, "such false representations" on the mother's part had no material bearing on the appellee's rights and "changed in no way the legal position [he] had already imposed upon himself, viz., the position of the natural father who has relinquished his rights by abandoning his child," which, of course, is merely a repetition of the claim answered adversely to the appellants in the consideration of the first portion of this contention.

The appellant's contention here, as we have stated it above, makes it unnecessary for us to determine, at this time, the exact meaning of the provisions of said Section 79, and how far the legislature may preclude the courts from opening, after a prescribed length of time, their judgments that have been rendered as the result of fraud perpetrated upon them, particularly when that fraud has resulted in a "jurisdictional" defect as the word "jurisdiction" is used in its primary, or fundamental, sense, so we leave the questions open.

Having ruled that the chancellor was not in error in finding that the natural father had not relinquished his parental rights, this second prong of the contention, which is also based upon the premise that he had abandoned the child, fails, as did the first; which means, of course, that the chancellor was correct in annulling the decree of adoption.

II

This brings us to the question of the child's custody. We have stated many times that in cases involving the custody of infants, primary consideration is to be given to the welfare and best interests of the infant. We reaffirm that statement. This Court stated in *Ross v. Pick,* 199 Md. 341, 351, 86 A. 2d 463:

> "Moreover, while the parents are ordinarily entitled to the custody of their minor children by the natural law, the common law, and the statute, this right is not an absolute one, but may be forfeited where it appears that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interests of the child * * *.

· "Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary."

This language was repeated by us in the recent case of *Trenton v. Christ,* 216 Md. 418, 140 A. 2d 660. Little, if any, effort was made in the instant case to show that the father was unfit to have the custody of his son. Some attempt was made by the appellants, when their counsel cross-examined the appellee, to show that he had not been a high wage earner, but this fact, alone, would not constitute unfitness. As was stated in *Alston v. Thomas,* 161 Md. 617, 620, 158 A. 24: "In determining what disposition should be made, [of an infant in an adoption case] the station in life and the poverty of the father is not to weigh against his claim, since an humble status and indigence are the honorable condition of many, and often the fruitful soil of virtue, discipline, and aspiration." There was no showing that he declined to work, or neglected his family; that he failed to produce a reasonable, although perhaps small as gauged by some standards, amount of money to support his dependents; that he was immoral or intemperate; or that he did not have a genuine parental affection for his child. In argument, the appellants laid great stress upon the fact that the appellee had been found guilty, upon the complaint of the mother, of "striking" the daughter. But this one instance occurred in 1953; the father and mother lived together, with the child, for some four years thereafter; and, after the separation, the mother requested the father to take the girl. Had the mother considered this isolated instance of a very grave and serious import, she would hardly have made this request. The record, we think, fails to show that the father was an unfit person to have the custody of his child. Likewise, the record is barren of any showing of unusual or exceptional circumstances that would render his custody of the child detrimental to the best interests of the boy.

With regard to the trial court's not requiring a second investigation and report from the Probation Department, it is

sufficient to say that, in deciding where to place the custody of an infant, the trial court is at liberty to consider the report and recommendations of the Probation Department, but they are advisory only, *Crump v. Montgomery,* 220 Md. 515, 154 A. 2d 802, and there is no statute or rule of court that makes it mandatory for the court to have an investigation made by the Probation Department.

We deem it appropriate to say that neither the pleadings nor the testimony contain anything derogatory to the appellants. They, apparently, were the innocent and unfortunate victims of the fraud of the natural mother.

*Order affirmed, with costs.*