JOSEPH EUGENE VENABLES, also known as Joseph
Venables Ayres v. JOHN J. B. AYRES

[No. 1382, September Term, 1982.]

*Decided May 4, 1983.*

The cause was argued before LOWE, WILNER and ALPERT, JJ.

*Walter D. Webster,* with whom were *Webster, Walsh & Spery* on the brief, for appellant.

*Fulton P. Jeffers,* with whom were *Hearne & Bailey, P.A.* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

This is an extraordinary case that is complicated by an unusual statute. It presents to us two questions:

(1) Can a dead person become an adoptive parent; *i.e.,* is a decree of adoption valid if entered after the adoptive parent has died; and

(2) If such a decree is invalid, has the Legislature nevertheless insulated it against collateral attack after the expiration of one year?

On October 21, 1975, Denward Collins Ayres, then sixty-one years old, filed a petition in the Circuit Court for Wicomico County in which he sought to adopt appellant, his forty-one year old stepson. The petition was prepared by a Salisbury attorney, Walter D. Webster, who attached to it the written consents of appellant's mother, then the petitioner's wife, and appellant.

The petition alleged that appellant's father had disappeared in 1936 and was presumed to be dead.

Nonetheless, in an apparent attempt to avoid any subsequent challenge should the natural father still be alive, the parties decided to give public notice of the proceeding in accordance with Maryland Rule D74. Upon petitioner's motion, however (also prepared by Mr. Webster), the court excused petitioner from giving the notice by publication in the newspaper (Maryland Rule 105b.1) and instead, on October 22, 1975, issued a show cause order noting the filing of the petition and directing,

> "that a copy of this Order be posted by the Sheriff of Wicomico County, Maryland, at the front door of the Court House of Wicomico County, Maryland, for a period of not less than sixty (60) days, giving notice to the public generally of the object and substance of the petition and warning anyone who may have an interest in these proceedings to show cause, if any there may be, on or before the *22nd* day of *January,* 1976, why a Decree should not be passed as prayed."

*See* Maryland Rule 105b.2.

A copy of that order was, in· fact, posted on the Court House door by the sheriff on October 24, 1975.

On January 23, 1976, the attorney, Mr. Webster, presented to the court a final order of adoption, declaring appellant to be the legally adopted son of Denward Collins Ayres and changing his (appellant's) name to Joseph Venables Ayres. Mr. Webster knew at the time that he presented the order that his client, the petitioner, had died on December 4, 1975 — some fifty days earlier, before even the sixty-day posting period expired — but he neglected to inform the court of that fact.[1] Unaware of the petitioner's death and presuming that all procedural prerequisites had been satisfied, the court signed the order and then, in accordance with Maryland Rule D81, sealed the file.

---

1. At oral argument in this appeal, Mr. Webster conceded his knowledge of the petitioner's death and his omission to inform the court of that important fact. *Compare* Code of Professional Responsibility, Disciplinary Rules DR 7-102 and DR 1-102.

On April 23, 1982 — more than six years after these events occurred — John J. B. Ayres, appellee, alleging himself to be the natural son of Denward Collins Ayres, filed a petition to reopen the adoption proceeding and declare the adoption null and void. He averred that he did not become aware of the adoption until March, 1982, when, as an adopted child, appellant claimed a share in the estate of a collateral relative.[2] The petition noted that Denward Ayres had died on December 4, 1975 — before the order of adoption was signed, asserted upon information and belief that the court was unaware of that fact when it signed the order,[3] and argued that "the presentation of said Order to the Court after the death of Denward Collins Ayres was improper and violated the rules of procedure and ethical responsibilities applicable thereto."

Appellant, through Mr. Webster, responded to this petition with a demurrer in which he claimed that (1) there was no procedural irregularity in the adoption proceeding, (2) appellee had no standing to reopen the case, (3) Md. Code Ann. art. 16, § 79 prohibits any attempt to invalidate a final decree of adoption after one year, and (4) appellee's petition was barred by laches. The court overruled the demurrer. In an Opinion and Order entered on June 28, 1982, it stated that the court had *not* been notified of Denward Ayres' death prior to signing the adoption order. It concluded that it was "incumbent upon the parties to bring to the Court's attention the death of one of the primary parties to the adop-

---

**2.** In his 1975 petition, Denward Collins Ayres acknowledged that he had a natural son, John James Ayres, then thirty-eight years old, who resided in Amherst, Massachusetts. No other children or blood relatives of any kind were mentioned in the petition. Although Maryland Rule D74c.2 permitted service of the adoption petition upon appellee, as a next-of-kin, no such service was required by the court.

**3.** Because the court file had been sealed, appellee's averments were largely based upon collateral information. His petition alleged that, through counsel, he had contacted Mr. Webster, and that

"Mr. Webster advised that he was the attorney for Denward Collins Ayres in said [adoption] Petition but stated that the adoption took place several years prior to Mr. Ayres' death, but when advised of the facts herein, stated that he had little recollection of the case due to the passage of time and did not hereafter [sic] deny the facts herein alleged."

tion," that "[s]uch a failure is unjustified and inexcusable," and that it "suggest[s] a grave irregularity in the adoption process." Acting pursuant to Maryland Rule 625a and upon the authority of *Falck v. Chadwick,* 190 Md. 461 (1948) and *McClary v. Follett, Jr.,* 226 Md. 436 (1961), the court determined that it had the power to reopen the case and vacate the adoption order.

The actual exercise of that authority came on August 31, 1982, in response to appellee's motion for summary judgment. In a further Opinion and Order, the court confirmed its earlier conclusions, declared the adoption order a nullity, and determined that, as a result, "neither [appellee's] standing nor laches are relevant questions." The court, it said, could and should declare the order null and void *sua sponte,* which it then proceeded to do.

In this appeal, appellant raises essentially the same issues he raised below, which we shall discuss in the context of the questions framed above.

### (1) *Can A Dead Person Become An Adoptive Parent?*

The underlying issue here, of course, is whether the death of the petitioner — the would-be adoptive parent — abated the adoption proceeding so as to nullify, or render ineffective, any decree unwittingly entered thereafter.

The general rule regarding the abatement of equity actions derives from Md. Code Ann. Courts art., § 6-401(b) and Maryland Rule 220b. The Code provision states that "[a] right of action in equity survives the death of either party if the court can grant effective relief in spite of the death." The Rule provides that "[a]n action in equity shall not abate by the death of a party thereto, where the right involved in the action survives." Read together, what these provisions mean is that the action survives if the right survives and the right survives if the court can continue to grant effective relief. Restated; the conclusion of this categorical syllogism is that an equity action will abate upon the death of a party unless the court can continue to grant effective relief in spite of the death.

It is self-evident that, under this standard, an adoption

proceeding must necessarily abate upon the death of the would-be adoptive parent. Whether the purpose of the adoption be the normal one of assuming the deeply personal and continuing role of parent or merely to confer upon a stranger the status of heir *(see Ex Parte Libertini,* 244 Md. 542 (1966)), it becomes incapable of fulfillment once the would-be parent has died. Upon that event, therefore, the court loses its ability "to grant effective relief." *See Besche v. Murphy,* 190 Md. 539, 552 (1948), where, in *dicta,* the Court stated unequivocally that "we cannot declare an adoption after the death of the [would-be adoptive parent]." [4] *See also McCurley, Ex'r. v. McCurley,* 60 Md. 185 (1883) and *Corte v. Cucchiara,* 257 Md. 14 (1970), concluding that a divorce action abates upon the death of one of the parties, and *In Re Estate of Freud,* 331 N.Y.S.2d 224 (1972), where, in a case remarkably similar to the one at bar, the Westchester County Surrogate's Court held, at pp. 225-26:

> "The fundamental purpose of an adoption is to establish the relationship of parent and child between living human beings. The proceeding is distinctly personal in nature and, therefore, abates upon the death of either the adoptive parent or the child. The 'adoption does not become final until the order of the court . . .' and can never become final if either the adoptor or adoptee dies before the order is signed. Any adoption order made thereafter,

---

4. *Besche v. Murphy* involved an attempt by the complainant to take under the will of a testatrix as an adopted child. Although she had never formally been adopted by the testatrix, the complainant alleged that, since childhood, she had lived with the testatrix and that the testatrix had expressly agreed to adopt her and had always regarded her as an adopted daughter. In light of that, she argued a theory of "equitable adoption," claiming the same right of inheritance as though she had been legally adopted. The Court rejected that claim on the basis that, because the complainant was seeking to take under the will and not as an heir at law, for the Court to recognize the claim would be tantamout to rewriting the will. *See* 190 Md. at 552. It was in that context that the Court ended its Opinion thusly: "*Since we cannot declare an adoption after the death of the testatrix,* and in the absence of such adoption the appellant does not come within, or constitute the class of those to whom the property is left, the decree will have to be affirmed." *Id.,* 552. (Emphasis supplied.)

whether purporting to speak *nunc pro tunc* or not, is necessarily void."

*See also In Re Estate of Conway,* 346 N.Y.S.2d 682 (N.Y.Co.Surr.Ct. 1973), and *cf. In Re Adoption of Bradfield,* 642 P.2d 214 (N.M.App. 1982).

The holding in *Freud* is entirely consistent with the pronouncements in *Besche, McCurley,* and *Corte,* and we think it is expressive of the Maryland law. *Compare* Mass. Gen. Laws Ann., ch. 210, § 6B and 42 U.S.C. § 416(e), as interpreted in *Williams v. Richardson,* 523 F.2d 999 (2d Cir. 1975), in which, under certain circumstances, an adoption is statutorily permitted, or recognized, after the death of the adoptive parent.

### (2) Statute of Limitations

Although conceding at oral argument that, had the court known of the death of Denward Collins Ayres, it would not have signed the adoption order, appellant nonetheless defends the attack against it on the basis of Md. Code Ann. art. 16, § 79, which is part of the State adoption law. Section 79 provides: "No attempt to invalidate a final decree of adopting *by reason of any jurisdictional or procedural defect* shall be received by the court, or by any court of this State, unless regularly filed with such court within one year following the entry of the final decree." (Emphasis supplied.)

Section 79 is not a particularly easy statute to interpret, especially in light of its history.

The preceding adoption law (Md. Code Ann. (1939), art. 16, §§ 78-84) contained no special provisions regarding the reopening of final decrees. By judicial construction, adoption decrees were treated in the same manner as other equity decrees; *i.e.,* "[i]n adoption cases, as in other equity proceedings, a decree will not be revoked after it is enrolled in the absence of fraud, mistake, surprise, or irregularity in its obtention, but will be considered as final and binding." *Falck v. Chadwick,* 190 Md. 461, 467 (1948). In *Falck,* which was decided after the enactment of § 79, but on the basis of the preexisting law, the Court found sufficient evidence of fraud

to permit the reopening of an enrolled adoption decree; *compare Backus v. Reynolds,* 159 Md. 601 (1930), where the same rule was applied but none of the enumerated deficiencies were found to exist.

Section 79 was enacted in 1947 as part of a general revision of the State adoption laws. The new Act was the product of a gubernatorial study commission, and § 79 was adopted by the Legislature exactly as proposed by that commission. *See Tentative Report Of The Commission To Study Revision Of Adoption Laws,* Daily Record, June 1, 1946, p. 2; *also* 1947 Md. Laws, ch. 599, § 85L.

The commission report is silent as to the exact function and meaning of § 79. The only contemporary discussion of that section still surviving in the public domain appears in a law review article authored by Professor Strahorn, who was a consultant to the commission; and that is none too illuminating. *See Changes Made By The New Adoption Law,* John S. Strahorn, Jr., 10 Md.L.Rev. 20 (1949). The relevant passage appears at pp. 43-45:

> "While the old statute had no provision as such for the revocation of an adoption once granted, and left the possibility to be that of either a new adoption by the original family, or an attack on the adoption for fraud in its original obtention, the new statute has more explicit terminology about it.
>
> * * *
>
> [S]ection 85L [now § 79] ... provides that no attempt to invalidate a final decree for its jurisdictional or procedural defects shall be received by any court unless filed within one year following the entry of the final decree. While this may not have been intended to extend the possibility of revocation, as such, which did not exist under the older statute, yet it certainly puts a limitation on any attempt at revocation, to the extent to which such attempt is possible. Thus it is that, subject to the changes in these connections, applicable only in

part of the State, the seven counties are exempt from this,[5] the possibility of revocation has not been very much changed."

Section 79 has been before the Court of Appeals on but one occasion. In *McClary v. Follett, Jr.*, 226 Md. 436 (1961), the natural father of a child was successful, on the ground of fraud, in vacating an adoption decree that had been entered more than a year earlier. The child's mother, who had temporary custody following the separation of the parties, put the child up for adoption without the father's knowledge. The mother falsely swore that she was unmarried, that the child had been born out of wedlock, and that she did not know the whereabouts of his father. The father made diligent efforts to locate his son, but did not learn of the adoption until some seventeen months after the final decree was entered.

The chancellor, finding that the mother had perpetrated a "gross fraud," determined that "irrespective of the provisions of Section 79 . . . due to the fraud and lack of notice or consent, the decree of adoption should be declared null and void." 226 Md. at 439. The adoptive parents, who were nearly as much the innocent victims of the fraud as the natural father, appealed, primarily on the basis that the father had abandoned the child and that the mother's fraud had no material bearing on their rights.

The Court of Appeals rejected the "abandonment" argument. Though acknowledging, and indeed quoting, § 79, the Court deftly sidestepped it. At p. 441:

---

5. As originally enacted, the new Act exempted seven counties from all of its provisions. Since the Act also repealed the preexisting adoption laws, that created some concern as to what law prevailed in those seven counties. A curative Act was quickly passed at a special session of the Legislature in the fall of 1947, which exempted the seven counties from certain provisions of the new law, including the predecessor to § 79, and, in lieu thereof, resurrected the law previously in effect for those subdivisions. It was not until July 1, 1982, that the last of the exemptions was repealed and the full Act became applicable Statewide. *See* 1982 Md. Laws, ch. 514, repealing Md. Code Ann. art. 16, § 88. As of June 30, 1982, four counties remained exempt from § 79. As the order revoking the adoption order was not entered until after July 1, 1982, however, we need not consider the latent "equal protection" issue which may arise from the exemptions.

"The appellant's contention here [abandonment] . . . makes it unnecessary for us to determine, at this time, the exact meaning of the provisions of said Section 79, and how far the legislature may preclude the courts from opening, after a prescribed length of time, their judgments that have been rendered as the result of fraud perpetrated upon them, particularly when that fraud has resulted in a 'jurisdictional' defect as the word 'jurisdiction' is used in its primary, or fundamental, sense, so we leave the questions open."

We do not have the privilege of the *McClary* Court of continuing to leave these questions open. Section 79 is squarely before us, and we must deal with it. In doing so, however, we need not remain oblivious to what the Court in fact did in *McClary;* though expressly declining to address § 79, it sanctioned the vacating of a final adoption order more than one year after its entry notwithstanding that statute.

We regret that the *McClary* Court did not consider the implications of § 79, as it could easily have reached the same result, in a manner consistent with its earlier decisions in *Falck v. Chadwick* and *Backus v. Reynolds,* both *supra,* by doing so.

Those earlier cases, it will be recalled, treated adoption decrees in the same manner as other equity decrees, and recognized that, even after enrollment, the court could set them aside for fraud, mistake, surprise, or irregularity. That general authority, of course, remains extant in the form of Maryland Rule 625a and Md. Code Ann. Courts art., § 6-408, the only difference being that "surprise" is no longer regarded as an independent ground, but is regarded as being in the nature of an "irregularity." *See Tasea Investment Corp. v. Dale,* 222 Md. 474, 478 (1960); *Cohen v. Investors Funding Corp.,* 267 Md. 537, 540 (1973).

It is not uncommon for States to have special statutes of limitations applicable to final adoption orders, but, unlike its counterparts in several other States, § 79 is a very limited statute. The Uniform Adoption Act (1969), for example,

provides in § 15 that, after a specified period and with limited exceptions, a final adoption decree "cannot be questioned by any person . . . in any manner upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter. . . ." [6] *See also* Ala. Code (1982 Supp.), § 26-10-5(c), precluding attacks after five years "because of any irregularity, infirmity or defect in the adoption proceedings"; Neb. Rev. Stat. (1978 Repl. Vol.), § 43-116, creating a *conclusive* presumption that after two years the adoption and the proceedings in connection with it "are valid in all respects notwithstanding some defect or defects may appear on the face of the record"; and N. C. Gen. Stat. (1976 Repl. Vol.), § 48-28(a), precluding attacks on an adoption decree "by reason of any defect or irregularity therein, jurisdictional or otherwise."

In sharp contrast to these counterparts, § 79, enacted by a Legislature that was presumably cognizant of *Backus,* is much more limited. It does not purport to insulate adoption decrees against attack for fraud, or even for mistake, but only "by reason of any jurisdictional or procedural defect."

The fraud found to exist in *McClary* was of the "extrinsic" type. The father had "been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court . . . [he] never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff. . . ." *United States v. Throckmorton,* 98 U.S. 61, 65-66 (1878). That is precisely the kind of fraud that will justify a court, under what was formerly its inherent authority and now under Maryland Rule 625a and Courts art., § 6-408, in reopening and vacating an enrolled decree. *See Schwartz v. Merchants Mort. Co.,* 272 Md. 305 (1974).

Thus, the *McClary* factual setting illustrates that, while there is certainly an area of overlap, § 79 is not entirely and irreconcilably inconsistent with the court's broader revisory

---

**6.** 9 U.L.A. 1 (1982 Supp.) reports that the Uniform Adoption Act has been adopted in Arkansas, Montana, New Mexico, North Dakota, Ohio, and Oklahoma. It appears that Alaska and New Hampshire have also adopted § 15 of that Act.

power under Rule 625a or § 6-408, which continue to be applicable to *all* judgments and decrees, in law and in equity. *Hughes v. Beltway Homes, Inc.,* 276 Md. 382 (1975); *Owen v. Freeman,* 279 Md. 241 (1977). *See also Haskell v. Carey,* 294 Md. 550 (1982); *Adoption of Sewall,* 242 Cal.App.2d 208 (1966).

That analysis, though important to an understanding of the proper scope and relationship of § 79, does not directly resolve the problem now before us. What the circuit court termed a "grave irregularity" was nothing short of a fraud. But it appears to have been more of an "intrinsic" fraud committed upon the court in the course of the judicial proceeding rather than the "extrinsic" type of fraud evident in *McClary;* and the law is clear that the court's authority under Maryland Rule 625a or § 6-408 to revise an enrolled decree for fraud is limited to the "extrinsic" type of fraud. *See Schwartz v. Merchants Mort. Co., supra,* 272 Md. 305. The court's reliance upon *Falck* and *McClary,* therefore, was misplaced.

That is not to say, however, that the court's ultimate action was wrong.

An event, or series of events, can have more than one effect, more than one legal implication; and that is the case here. The attorney's deception — his concealment of the petitioner's death — constituted an intrinsic fraud upon the court which may be beyond remedy under the court's general revisory power. But the petitioner's death itself had an independent significance. It abated the action because, as we have concluded, it prevented the court, as a matter of law, from granting further effective relief.

A dead person cannot become an adoptive parent because it is naturally and physically impossible for him to discharge any of the duties or accept any of the benefits of that relational status; and a court, whatever its other jurisdictional attributes, can no more wipe away or overcome that impossibility with a piece of paper than it can rearrange the stars or change the tides. The very effort is an entirely futile gesture.

Although the decisions as to whether a defective judgment

is void or voidable are not free from conflict, as Freeman points out (1 *Freeman On Judgments,* § 325), "[w]ant of power to grant the relief contained in the judgment" generally renders the judgment a nullity, void on its face. The status of such a void judgment is aptly described by Freeman, § 322, as quoted by the Court in *Fooks' Executors v. Ghingher,* 172 Md. 612, 619 (1937):

> "A judgment void upon its face and requiring only an inspection of the record to demonstrate its invalidity is a mere nullity, in legal effect no judgment at all, conferring no right and affording no justification. Nothing can be acquired or lost by it; it neither bestows nor extinguishes any right, and may be successfully assailed whenever it is offered as the foundation for the assertion of any claim or title. It neither binds nor bars any one. All acts performed under it and all claims flowing out of it are void. The parties attempting to enforce it may be responsible as trespassers. The purchaser at a sale by virtue of its authority finds himself without title and without redress. No action upon the part of the plaintiff, no inaction upon the part of the defendant, no resulting equity in the hands of third persons, no power residing in any legislative or other department of the government can invest it with any of the elements of power or of vitality. * * * Such a judgment has been characterized as a dead limb upon the judicial tree, which may be chopped off at any time, capable of bearing no fruit to plaintiff but constituting a constant menace to defendant."

*See also Hughes v. Aetna Casualty & Surety Company,* 383 P.2d 55 (Or. 1963), but *compare Husband (G.T.B.) v. Wife (G.R.),* 424 A.2d 12 (Del. 1980).

That was the nature of the adoption order entered in January, 1976. Although the court formally vacated that order, it did not need to be vacated because it never had life. It was stillborn; there never coursed in its veins anything more

than embalming fluid. The court's action, then, was but a perfunctory surplusage designed only to straighten out the court records and clarify that the status of the parties had never changed. Such an action did not need to rest upon the authority of Maryland Rule 625a or § 6-408; and neither § 79, laches, nor appellee's asserted lack of "standing" to bring the matter to the court's attention can suffice to prevent or invalidate it. The order did not "invalidate" the adoption, which is what § 79 purports to preclude if based on "jurisdictional or procedural defect"; it simply declared that the adoption never happened.

Finally, as a cautionary note to trial courts, this case illustrates rather clearly the potential hazards in entering final adoption orders without ever laying eyes on the parties. It is, of course, possible for a party — either parent or child — to die in the brief interim between an appearance before the court and entry of the decree; but, as a practical matter, the opportunity for fraud, mistake, or irregularity would, it seems to us, be greatly lessened if the court were to require a personal appearance by the parties (or, in the case of a young child, someone on the child's behalf) before issuing a final order. Trial courts would thus be prudent to regard Maryland Rule D77 ("The court shall hold such hearing as justice may require. The hearing shall be conducted with such privacy as the court may direct.") as requiring an evidentiary hearing of some sort in *every* case.

> *Judgment affirmed; appellant to pay the costs.*