466 A.2d 1301

**Shirley K. WEINSCHEL**

v.

**Sally Ann STROPLE.**

**No. 630, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Nov. 4, 1983.

Harvey B. Steinberg, Rockville, with whom were James Robert Miller, Miller & Steinberg, Rockville, Richard Schifter, P.C. and Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., on brief, for appellant.

Margaret H. Long, Rockville, with whom were Brodsky, Greenblatt & Renehan, Chartered, Rockville, on brief, for appellee.

Argued before GILBERT, C.J., and ALPERT and BLOOM, JJ.

GILBERT, Chief Judge.

We are asked in this appeal whether the natural mother of two children may consent to their adoption by the wife of her ex-husband, the father of the children, and at the same time retain the right of temporary but regular visitations.

The parties, Bruno Weinschel and Sally Ann Strople, were married in 1967. Two children, Lisa Tara, age 12, and Dana Leslie, age 9, were born of that union. The marriage was "put asunder" on August 26, 1980, by a decree of the Circuit Court for Montgomery County.[1] The decree apparently followed protracted litigation in the State of Florida.

---

1. Sally Ann Strople, pursuant to the decree of divorce, was allowed to resume her maiden name.

A "Marital Settlement Agreement" was filed in the divorce proceeding by the father. By terms of that agreement the father was awarded custody of the two children. Embodied in the agreement was the following significant language:

"2. *Adoption of the Children*

(a) BRUNO has indicated his intention of marrying SHIRLEY [Kittredge (hereinafter Shirley or the adoptive mother)]. In the event SHIRLEY files a petition to adopt the children, SALLY hereby agrees to consent to said adoption. Notwithstanding the Judgment of adoption of the children by SHIRLEY, SALLY's rights to visit as set forth in this Agreement shall not be impaired or diminished.... Further, it is understood and agreed by the parties that SALLY's right to visitation is an integral part of this Agreement and any adoption decree shall specifically incorporate the visitation provisions set forth in this Agreement." [2]

Shirley Kittredge married Bruno Weinschel and thereafter filed a petition in the Circuit Court for Montgomery County for the adoption of Lisa Tara and Dana Leslie. Ms. Strople in her response recited the language of the agreement that was applicable to visitation with the children. Additionally, she filed a paper writing entitled "Consent With Waiver." In that document she said, in pertinent part: "I hereby join in the foregoing Petition and waive notice of process, reserving, however, to myself the visitation rights enumerated in a Marital Settlement Agreement."

---

2. The agreement provides further that it "shall be interpreted under the law of the State of Florida." Apparently that proviso was ignored by the parties since there seems to be no notice pursuant to Md.Cts. & Jud.Proc.Code Ann. § 10–504. Inasmuch as Florida law was not cited to or relied upon by the Circuit Court, we assume the parties abandoned that part of the agreement.

The chancellor, on February 20, 1981,[3] without a hearing,[4] granted Shirley's petition for adoption of the two children. In the final decree of adoption the court provided for specific periods of visitation by the children with the mother. The visitation time as specified in the decree was literally the same as the parties had agreed to in the "Marital Settlement Agreement."

Although it is not clear from the record exactly how the matter happened to appear before a master in chancery two years after the decree, it did nevertheless. We were told in oral argument that a question of tutoring Lisa arose and that the tutoring would conflict with the visitation schedule. Seemingly, the master had a question about his authority in the case and referred it to the judge who had signed the decree. We infer that the judge reexamined his position with respect to the decree. Based on his audit of the law, the judge, *sua sponte,* issued a "show cause order" to all three of the signatories to the original agreement. The order directed that the parties appear and show cause "why . . . [the] Final Decree of Adoption of February 20, 1981, should not be set aside pursuant to Maryland Rule 625(a)." That Rule provides:

"For a period of thirty days after entry of a judgment, or thereafter pursuant to a motion filed within such period, the court shall have revisory power and control over such judgment. After the expiration of such period the court shall have revisory power and control over such judgment, only in case of fraud, mistake or irregularity."

Following a hearing at which the chancellor heard arguments of counsel, he filed a "Memorandum and Order." In the memorandum the judge held that a hearing on the adoption petition should have been conducted because the natural mother's consent to the adoption was conditional

---

3. Had the decree been dated three days later, Lisa Tara's consent to the adoption would have been required. Art. 16, § 72.

4. *See* Md.Rule D77 which provides that, "[t]he court shall hold such hearing as justice may require."

upon visitation. The court noted that *Spencer v. Franks,* 173 Md. 73, 195 A. 306 (1937), an adoption case, struck down a natural mother's visitation rights. Moreover, the judge was of the view that inasmuch as Ms. Strople's and the children's visitation rights were at stake, a hearing was mandated.

We distill from the judge's memorandum that he believed he was without authority, in the light of *Spencer v. Franks, supra,* to grant visitation rights to the natural mother, and at the same time grant Shirley Weinschel's petition for adoption. Apparently the chancellor felt that there could be no conditional adoption and, therefore, the natural mother should be afforded a hearing where she would have the opportunity to withdraw her consent and litigate the adoption petition. The judge concluded that he had made a mistake within the meaning of Md.Rule 625 subd. a. He, therefore, "set aside" the decree of adoption that he had signed two years earlier.

We think that there are several reasons why the chancellor should not have vacated the decree of adoption. We shall discuss each of them.

Md.Rule D77 does not require a hearing in every case but only in those cases where justice dictates a hearing. Thus, if *Spencer v. Franks, supra,* prohibits the natural mother's visitation with her children, justice would require that there be a hearing in order that the chancellor could determine whether adoption was warranted, notwithstanding the mother's objections. Although in *Venables v. Ayres,* 54 Md.App. 520, 459 A.2d 601 (1983), we suggested that it was "prudent to regard Maryland Rule D77 . . . as requiring an evidentiary hearing of some sort in *every* case," our suggestion is just that, a suggestion. If a hearing is to be required in every case, and that might well be the wiser course to follow, it is for the Court of Appeals to so decide. They, not this Court, are the rule makers who exercise supervisory power over the courts of Maryland.

■ The reason no hearing was required in the matter *sub judice* is that *Spencer v. Franks, supra,* does not condemn all adoption decrees that contain a provision relative to visitation rights by the natural parent. *Spencer* was concerned with a totally different factual situation than that in the instant case. In *Spencer* the mother and father separated. An approximately seven month old child was left in March, 1931, in the care of the father's sister and her husband. After agreeing in December, 1931, to the adoption of the child by the father's sister, the natural mother reneged. A petition for adoption was filed by Mrs. Franks and her husband, they being the father's sister and brother-in-law. The natural mother resisted the adoption, although the natural father consented to it. The trial judge, in an obvious attempt to please all, incorporated in the decree of adoption the phrase: " 'With leave to parents to occasionally see the child.' " 173 Md. at 77, 195 A. 306.

The Court of Appeals, speaking through Judge Parke, said in *Spencer:* "The power to decree an adoption did not exist at common law ... [and therefore] the measure of the chancellor's authority is the statute." 173 Md. at 81, 195 A. 306.

The judge went on to comment that *"the general effect of the decree of adoption under the statute was to terminate the legal relations between the child and its natural parents ...."* *Id.* at 82, 195 A. 306. (Emphasis supplied.) The statute, he said, contemplated, "that the custody of the infant, which was an incident of the parental relation, would no longer be the right of the natural parents, but would be the exclusive right of the adoptive parents." *Id.*

Later, in *Dawson v. Eversberg,* 257 Md. 308, 262 A.2d 729 (1970), the Court considered a situation wherein the natural father lived with the natural mother for a protracted period of time. At adoption proceedings brought by the natural father and his wife, the chancellor turned aside the natural mother's objection to the adoption, but reserved unto the natural mother "whatever rights she had as the natural

mother." 257 Md. at 311, 262 A.2d 729. The decree of adoption declared that nothing in it "shall affect the parental rights of . . . the natural mother of . . . [the] infants." *Id.* Md.Ann.Code art. 16, § 78(b) provided that when a final decree of adoption is entered, "the natural parents . . . shall . . . be divested of all rights with respect to such person." Because the *Dawson* decree directly conflicted with Md.Ann. Code art. 16, § 78(b), the Court of Appeals remanded for further consideration by the chancellor.

*Spencer* and *Dawson* are factually inapposite to the matter now before us. In both cases the adoption was granted over the objection of the natural mother, and the adoptive parent opposed visitation by the natural parent.

While *Spencer* and *Dawson* are concerned with the protection of the child and adoptive parent from unwanted interruption by the natural parent, neither decision forbids the type of agreement reached in the matter *sub judice.* On the contrary, *Spencer,* states:

> "In the absence from the record of clear and satisfactory proof that the welfare of the child requires the intervention of the court to compel the adoptive parents to surrender temporarily but regularly the custody of the child to the natural mother, *the court is of the opinion that the privilege of seeing the child should have been left to the discretion and determination of the adoptive parents.*" (Emphasis supplied.) 173 Md. at 86, 195 A. 306.

■ We think the language of *Spencer* allows the adoptive parent and the natural parent to enter into any agreement with respect to visitation rights between the child and the natural parent so long as the visitation is in the best interest of the child and public policy does not prevent such visitation.

■ We recognize that visitation between the natural parent and the adoptive child is unusual, at least while the child is a minor under the custody and control of the adoptive parent. Being unusual, however, does not make it

illegal, against public policy, or contrary to the best interest of the child.

The legislative purpose in enacting the adoption statutes is found in Md.Ann.Code art. 16, § 67(a). There it is stated:

"The General Assembly hereby declares its conviction that the policies and procedures for adoption contained in this subtitle are socially necessary and desirable, having as their purpose the threefold protection of (1) the adoptive child, from unnecessary separation from his natural parents and from adoption by persons unfit to have such responsibility; and (2) the natural parents, from hurried and abrupt decisions to give up the child; and (3) the adopting parents, by providing them information about the child and his background, and protecting them from subsequent disturbance of their relationships with the child by natural parents. A court, in passing on a petition for adoption, shall give due consideration to any assurance by the State Department of Social Services that it will provide or contribute funds for necessary support and maintenance for the adoptive child."

■ We perceive nothing in the legislative purpose or in the substantive provision of the statute (Md.Ann.Code art. 16, §§ 67–88) that precludes the adoptive parents and the natural parents from entering into an agreement regarding visitation with the child or children. Such agreement, as we have previously said, does not appear to run counter to public policy inasmuch as it will not ordinarily impede adoptions, but might even foster them in those cases where the natural parent and adoptive parent are known to each other and the natural parent is reluctant to yield all contact with his or her child.

■ Even if the agreement in the instant case is not clearly sanctioned by the adoption statutes, it is certainly not prohibited. Consequently, it is enforceable as a matter of contract law. Thus, the agreement entered into by the adoptive mother, the natural father and the natural mother could be specifically enforced. If the continued visitation by

Lisa Tara with her natural mother will result in psychological damage to the child, the court is empowered for such time as is in the best interest of the child to decline to enforce the agreement specifically. Notwithstanding any contractual arrangement relative to visitation, the paramount concern of the court must be the best interest of the child. That concern permeates the entire adoptive process.

Md.Ann.Code, art. 16, § 78(b) provides:

"The natural parents of the person adopted, if living, shall after the interlocutory decree, be relieved of all legal duties and obligations due from them to the person adopted, and shall be divested of all rights with respect to such person. Upon the entry of a decree of adoption, all rights of inheritance between the child and the natural relatives shall be governed by the Estates Article of the Code. Nothing contained in this section shall limit in any way the right of any person to provide for the distribution of his property by will."

We read § 78(b) as protective of the adoptive parents and their status with the adopted child. It insulates the adoptive parent and child from attack by a disruptive, displeased, dissatisfied or disappointed natural parent. Simultaneously, the section relieves the natural parent from responsibility for the care and welfare of the child, eradicates parental responsibility, and wipes out parental rights. The section, however, is a shield not a sword. It does not purport to mandate that the adoptive parents and the natural parents may not under any circumstance agree to visitation privileges by the natural parents with the shield they had yielded to the adoptive parents.

There is yet another reason why the Circuit Court should not have vacated the decree of adoption. Md.Ann.Code art. 16, § 79 provides:

"No attempt to invalidate a final decree of adoption by reason of any jurisdictional or procedural defect shall be received by the court, or by any court in this State, unless

regularly filed with such court within one year following the entry of a final decree."

Patently, the purpose of such a statute is to prevent unsettling the child and thereby inflicting psychological trauma to him or her.

While § 79 seems to be addressed to attempts by persons other than the court itself, we think the prohibition extends equally to the court. Thus, the chancellor may not *sua sponte* "set aside" a decree of adoption because of a jurisdictional or procedural defect.

The use by the judge of Md.Rule 625a to avoid the strictures of Md.Ann.Code art. 16, § 79 was incorrect. Absent fraud or an irregularity not encompassed within "any jurisdictional or procedural defect," the court is without authority to strike a final decree of adoption. That is not to say that where a fraud is practiced upon the court, as in *Venable v. Ayres, supra,* courts are powerless to right the wrong.

There is, however, no wrong in the instant case. The order of the Circuit Court that "set aside" the final adoption decree is vacated.

ORDER VACATED. COSTS TO BE PAID BY APPELLEE.