No. 96-040

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

DEBBIE GROVES,

        Petitioner and Appellant,

    v.

LONN CLARK and LORALEE CLARK,

        Respondents and Respondents.

FILED

JUL 26 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Robert P. Goff, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                David F. Stufft, Attorney at Law,
                Cut Bank, Montana

        For Respondents:

                James D. Elshoff, Attorney at Law,
                Great Falls, Montana

                        Submitted on Briefs:   May 16, 1996

                                Decided:   July 26, 1996

Filed:

_____
              Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

On July 24, 1995, Debbie Groves petitioned the District Court for the Eighth Judicial District in Cascade County for specific performance of a visitation agreement that she had entered into with Lonn and Loralee Clark. The Clarks filed an objection to Groves' petition and a brief opposing Groves' request for open adoption. On December 21, 1995, the District Court, by agreement of the parties, deemed the Clarks' objection a motion for summary judgment, concluded that the visitation agreement was void from its inception, and denied Groves' petition for specific performance. Groves appeals the District Court's order. We reverse the order of the District Court and remand the matter to that court for further proceedings in accordance with this opinion.

The issue on appeal is whether the District Court erred when it concluded that the visitation agreement executed between the birth mother and the adoptive parents prior to adoption was void as a matter of law.

FACTUAL BACKGROUND

Debbie Groves is the natural mother of Laci Lee Groves Clark. Laci lived with Groves from June 5, 1990, the date of Laci's birth, until approximately January 28, 1994, when Groves signed a document relinquishing custody of Laci to Lutheran Social Services (LSS) and consenting to adoption.

Prior to her relinquishment of Laci, Groves had become acquainted with Lonn and Loralee Clark, who had encouraged Groves to permit them to adopt Laci through LSS. At one of their

2

meetings, the Clarks told Groves that they would agree to an "open adoption" so that Groves could have visitation rights with Laci after the adoption. Groves was adamant that she would not consent to adoption until the Clarks signed a visitation agreement.

On January 11, 1994, the Clarks signed a post-adoption visitation agreement, and on January 14 Groves signed a separate but identical agreement. The agreement provided:

> This agreement pertains to Debbie's desire to have visitation time with Laci Lee Groves (DOB 6-5-90) after Laci is adopted by Lonn and Loralee Clark.
>
> Debbie desires the following:
>
> 1. I hope to be able to give a 2-day notice whenever I'd like have Laci go with me or whenever I'd like to come visit at the Clark home.
>
> 2. I would like to have telephone contact with Laci and the Clark's [sic] as often as I feel it is necessary.
>
> 3. I don't intend to take Laci out of school unless I have to go to Butte for some emergency. If that happens I do need to take Lacy [sic] with me.

The Clarks signed the agreement in the presence of a notary public. Their signatures followed a provision that read: "We, Lonn and Loralee Clark, are willing to honor Debbie Groves' wishes regarding her requests for contact with Laci Lee Groves." Groves signed an identical notarized agreement three days later.

On January 28, 1994, Groves executed a document entitled "Relinquishment and Consent to Adoption." In that document, Groves relinquished Laci to LSS and granted LSS the right to place Laci for adoption. In addition, Groves expressly waived service of any

3

notice of the proceedings for termination of her parental rights and placement of Laci for adoption, and agreed that LSS' executive director would appear at those proceedings as her attorney-in-fact to execute any documents that may have been required and to complete the placement of Laci in a suitable adoptive home. On February 2, 1994, the Eighth Judicial District Court entered an order awarding custody of Laci to LSS and terminating Groves' custodial and parental rights. After the Clarks filed a petition for adoption on September 23, 1994, that court entered a summary decree of adoption. At no time during the adoption proceedings did the Clarks mention their visitation agreement with Groves. As set forth in the "Relinquishment and Consent to Adoption," Groves did not participate in those proceedings.

Groves and the Clarks abided by the terms of the executed visitation agreement until June 5, 1995. On that date, when Groves telephoned the Clarks to make arrangements to visit Laci on her birthday, the Clarks refused and told Groves she could no longer visit her daughter. Prior to that time, the Clarks had allowed Groves to visit Laci on major holidays and on other occasions.

On July 24, 1995, Groves filed a petition requesting specific performance of her visitation agreement with the Clarks. In response, the Clarks filed an objection to Groves' petition and a brief in opposition to Groves' request for open adoption. The parties agreed that the Clarks' objection could be treated as a motion for summary judgment. The District Court denied Groves' motion for specific performance on December 21, 1995. In its

4

order, the court held that the "Relinquishment and Consent to Adoption" constituted the final, controlling agreement by Groves relating to Laci. Because that document did not reserve any visitation and because that document purported to "terminate all [Groves'] parental rights to [Laci], now and forever," the court concluded that Groves had given up all of her parental rights and had no claim for post-adoption visitation. Based on that conclusion, the court held that the parties' visitation agreement was void and unenforceable.

## DISCUSSION

Did the District Court err when it held that the visitation agreement executed between Groves and the Clarks prior to adoption was void as a matter of law?

In this case, the District Court treated the matter as appropriate for summary judgment pursuant to Rule 56, M.R.Civ.P. We review a district court's order for summary judgment *de novo* and apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. Rule 56(c), M.R.Civ.P., provides that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

The District Court denied Groves' petition for specific performance on the basis of its determination that Groves had voluntarily given up all of her parental rights to Laci in the "Relinquishment and Consent to Adoption" which she signed on

5

January 28, 1994. The court determined that that document constituted "the final agreement by Groves relating to the child," and concluded that its failure to reserve any visitation within its terms accomplished full termination of the relationship between Groves and Laci. In reaching its conclusion, the court relied on § 40-8-125, MCA, and *In re C.P.* (1986), 221 Mont. 180, 717 P.2d 1093.

Section 40-8-125, MCA, provides in relevant part:

(1) After the final decree of adoption is entered, the relation of parent and child and all the rights, duties, and other legal consequences of the natural relation of child and parent shall thereafter exist between such adopted child and the adoptive parents adopting such child and the kindred of the adoptive parents.

(2) After the final decree of adoption is entered, the natural parents and the kindred of the natural parents of the adopted child, unless they are the adoptive parents or the spouse of an adoptive parent, shall be relieved of all parental responsibilities for said child and have no rights over such adopted child.

In *In re C.P.*, 221 Mont. 181, 717 P.2d 1093, this Court interpreted § 40-8-125, MCA, to preclude visitation rights for the natural parents once a trial court has entered its final decree of adoption. Specifically, we stated:

This language [of § 40-8-125, MCA] is clear. When parental rights are terminated, the natural parent no longer has *any* rights over the child. This includes visitation rights.

*In re C.P.*, 221 Mont. at 183, 717 P.2d at 1095 (underlining added).

*In re C.P.* is distinguishable from this case, however. First, in *In re C.P.*, although the parties discussed including visitation rights in the final order, there was no indication in the record that the

6

parties reached any agreement on the issue. *In re C.P.*, 221 Mont. at 182, 717 P.2d at 1094. In contrast, in this case both parties voluntarily signed a notarized agreement which provided the terms of the visitation arrangement. In addition, the Court recognized in *In re C.P.* that the outcome of that case might have been different had there been a statute that provided for visitation after a final adoption decree and had the parties bargained for the right of visitation. In that case, we noted:

> Even if the statutes provided for such a retention of visitation rights, the record in this case contains *no* evidence to support such a finding . . . . There is no question that appellant disputed SRS obtaining permanent custody. Thus, there is no question of whether she agreed to their custody in exchange for visitation rights.

*In re C.P.*, 221 Mont. at 183, 717 P.2d at 1095. In this case, the parties did bargain for the right of visitation. In fact, Groves alleges that she agreed to termination of her parental rights and consented to place Laci for adoption only after the Clarks agreed to sign the visitation agreement. Furthermore, since our decision in *In re C.P.*, the Montana Legislature has enacted a statutory provision which recognizes agreements entered into between birth parents and prospective adoptive parents relating to the future conduct of the parties and the adoptive child. Specifically, § 40-8-136, MCA, enacted in 1989, provides in relevant part:

> (1) Prior to a hearing under 40-8-109, the birth parents, prospective adoptive parents, and their representatives shall file with the court a report of agreements and disbursements, and they shall serve a copy of the report on the central office of the department.

> (2) The report must contain:

7

(a) <u>all oral and written agreements between the parties that relate to the future conduct of a party with respect to the child.</u> If an oral agreement is reported, the substance of the agreement must be contained in the report and a copy of the report must be served on each party to the oral agreement. Copies of all written agreements must be attached to the report.

(Emphasis added.)

Although § 40-8-136, MCA, does not specifically reference visitation agreements or agreements for continuing contact, that statute does clearly refer to "the future conduct of a party with respect to the child." If, as this Court determined in *In re C.P.*, the termination of parental rights automatically terminates all rights of the natural parents over the child, then the future conduct of the natural parents with respect to the adoptive child would be irrelevant. Such a construction would render § 40-8-136, MCA, meaningless. It is well established that this Court must give meaning and effect to all statutory provisions, and that a construction which renders a provision meaningless is disfavored. *See, e.g., Montana Contractor's Ass'n v. Department of Highways* (1986), 220 Mont. 392, 395, 715 P.2d 1056, 1058; *Crist v. Segna* (1981), 191 Mont. 210, 212, 622 P.2d 1028, 1029. *See also* § 1-2-101, MCA. We therefore interpret § 40-8-136, MCA, to provide for the recognition of agreements for post-adoption contact and visitation. That does not, however, end our inquiry.

Section 40-8-136, MCA, provides that prior to a district court hearing for the relinquishment of parental rights and adoptive placement, "the birth parents, prospective adoptive parents, and their representatives shall file with the court a report of

8

agreements and disbursements, and they shall serve a copy of the report on the central office of the department." On appeal, the Clarks contend that Groves had a duty to file a report of the visitation agreement with the court and that her failure to do so waives her right to now object. The Clarks have, however, mistakenly interpreted the statute's requirements. Section 40-8-136, MCA, does not place the burden of filing an agreement solely on the birth parent, but rather provides that "the birth parents, prospective parents, and their representatives" share the requirement of filing any such agreement. (Emphasis added.) Furthermore, in this case, Groves had expressly waived her right to participate in the hearing for termination of her rights and adoption of Laci and had appointed LSS' director to act on her behalf. Therefore, it was the duty of both the Clarks, as prospective parents, and the director of LSS, as Groves' representative, to file a report of the executed visitation agreement. Groves should not be penalized for those parties' failure to comply with the requirements of § 40-8-136, MCA. Accordingly, we hold that the failure to file a report of the written visitation agreement does not, of itself, bar Groves' petition for specific performance.

In order to determine the merit of Groves' petition for specific performance, however, we must address a district court's responsibilities once a report of a visitation agreement between the natural parents and prospective adoptive parents has been filed with that court. It is well established that: "It is the policy

9

of the state of Montana to ensure that the best interests of the child are met by adoption proceedings." Section 40-8-114(1), MCA. To that end, "[t]he needs of the child must be the primary focus of adoption proceedings, with full recognition of the interdependent needs and interests of birth parents and adoptive parents." Section 40-8-114(3), MCA. It is therefore essential for a trial court, when it considers a post-adoption visitation agreement, to recognize that that agreement should only be given effect if continued contact between the natural parents and the child is in the child's best interest. If, following a hearing, the district court concludes that such an agreement is in the child's best interest, we conclude that there is no reason that such an agreement should not be enforced by the court.

Our conclusion that natural parents and prospective adoptive parents may contract for post-adoption visitation and that such agreements should be enforced when they are determined to be in the best interest of the child is supported by the case law of other jurisdictions. For example, in *People ex rel. Sibley v. Sheppard* (N.Y. 1981), 429 N.E.2d 1049, 1052-53, the Court of Appeals of New York concluded that the statutory creation of an adoptive family does not automatically require the complete severance of all further contact with former relatives. Similarly, the Maryland Special Court of Appeals held that the adoptive parent and the natural parent may "enter into any agreement with respect to visitation rights between the child and the natural parent so long as the visitation is in the best interest of the child and public policy

10

does not prevent such visitation." *Weinschel v. Strople* (Md. Ct. Spec. App. 1983), 466 A.2d 1301, 1305 (interpreting *Spencer v. Franks* (Md. 1937), 195 A. 306). Finally, the Connecticut Supreme Court upheld a visitation agreement that was negotiated in good faith in order to promote the best interest of the child and noted:

> The plaintiff's rights are not premised on an ongoing genetic relationship that somehow survives a termination of parental rights and an adoption. Instead, the plaintiff is asking us to decide whether, as an adult who has an ongoing personal relationship with the child, she may contract with the adopting parents, prior to adoption, for the continued right to visit with the child, so long as that visitation continues to be in the best interest of the child.
>
> . . . .
>
> Traditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents. We are not prepared to assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development.

*Michaud v. Wawruck* (Conn. 1988), 551 A.2d 738, 740-42 (footnotes and citations omitted).

We conclude that birth parents and prospective adoptive parents are free to contract for post-adoption visitation and that trial courts must give effect to such contracts when continued visitation is in the best interest of the child. We further conclude that Groves was not precluded from filing a petition for specific performance of the parties' visitation agreement solely on the basis of the Clarks' failure to file a report of the agreement with the District Court prior to the adoption proceeding. We therefore hold that the District Court erred when it summarily

11

denied Groves' petition for specific performance without a determination of whether continued visitation is in Laci's best interest. Accordingly, we remand this case to the District Court for a hearing on whether enforcement of the visitation agreement between Groves and the Clarks would be in Laci's best interest.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices